# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

JUSTIN CODY WILSON,

          Plaintiff,

    v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,[1]

          Defendant.

_____/

Case No. 1:16-cv-01861-SKO

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

(Doc. 1)

## I.  INTRODUCTION

On December 12, 2016, Plaintiff Justin Cody Wilson ("Plaintiff") filed a complaint under 42 U.S.C. § 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security Income (SSI).  (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of the Social Security Administration.  *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on February 27, 2017).  She is therefore substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

Magistrate Judge.[2]

## II.     BACKGROUND

On October 31, 2011, Plaintiff filed a claim for SSI payments, alleging he became disabled on February 25, 2011, due to bipolar disorder, "[b]roken ankles that have never healed," "leg problems," depression, "[f]antasies about harming others," and post-traumatic stress disorder (PTSD).[3]   (Administrative Record ("AR") 23, 25, 362, 385, 413–14, 445, 468.)   Plaintiff was born on August 28, 1988, and was 23 years old on the application date.  (AR 46, 362.)  Plaintiff has a high school education, and worked in maintenance at a convalescent hospital between 2008 and 2011.  (AR 28, 385–86.)

**A.     Relevant Medical Evidence**

**1.     Treating Physician Mike Kifune, M.D.**

On April 7, 2011, Plaintiff presented to Dr. Kifune with pain in his bilateral ankle and depression.  (AR 604–05.)   With respect to his ankle, Plaintiff reported that his pain was aggravated by movement, with decreased mobility, swelling, and weakness.  (AR 604.)  Plaintiff also reported that it was "somewhat difficult to meet home, work, or social obligations" due to social isolation and that his symptoms are aggravated by conflict or stress at work.  (AR 604.)  He stated that Depakote made him "calmer, but also tired."  (AR 604.)  Dr. Kifune's assessment of Plaintiff was that he had pain in his limbs and bipolar affect with depressed mood.  (AR 605.)

Plaintiff presented for a follow up appointment on May 12, 2011, complaining of "aching and sharp pain" in his left ankle.  (AR 606–08.)  Plaintiff also stated that his depression had "improved," but that he was still experiencing anxious, fearful thoughts, depressed mood, fatigue or loss of energy, poor concentration, indecisiveness and restlessness or sluggishness.  (AR 606.)  Plaintiff denied sleep disturbance.  (AR 606.)  Plaintiff also complained of worsening bilateral knee pain.  (AR 606.)  On examination, Dr. Kifune observed Plaintiff had a flat affect, but was

---

[2]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 4, 5.)
[3]  Plaintiff previously received SSI benefits based on disability as a child.  (AR 185.)  On February 19, 2010, an Administrative Law Judge (ALJ) concluded that Plaintiff's disability ended on June 1, 2007, and that Plaintiff had not become disabled against since that date.  (AR 185–93.)  Plaintiff does not challenge that decision here.  On April 20, 2016, the ALJ found that Plaintiff alleged "new impairments" constituting "changed circumstances" since the prior unfavorable decision, such that "the presumption of continuing nondisability does not apply."  (AR 20.)

negative for anhedonia, was not agitated or anxious, had no flight of ideas, and did not exhibit compulsive behavior. (AR 607.) Plaintiff behaved appropriately for his age, had normal knowledge, insight, judgment, and language, was not in denial, euphoric, or fearful, and did not have memory loss. (AR 607.) Plaintiff denied hallucinations, paranoia, obsessive thoughts, and suicidal ideation, but had mood swings and poor attention span and concentration. (AR 607.)

On July 1, 2011, Plaintiff complained of depression, musculoskeletal pain, and back pain. (AR 609–11.) Although he experienced issues with extreme anger and irritability after going without medication for four days, he reported "doing much better" after taking all of his medication regularly. (AR 609.) Dr. Kifune observed Plaintiff had an irritable affect, but was negative for anhedonia, and denied hallucinations, hopelessness, paranoia, obsessive thoughts, suicidal ideation, and memory loss. (AR 610.) Plaintiff exhibited normal insight, attention span, and concentration, but poor judgment. (AR 610.) He was not agitated, anxious, and did not exhibit compulsive behavior. (AR 610.)

Plaintiff complained of left ankle pain and presented with the symptoms of a "major depressive episode" on September 1, 2011. (AR 612–14.) Plaintiff reported that his medication relieved his symptoms. (AR 612.) His overall appearance was "depressed," but he was negative for anhedonia and had no compulsive behavior or mood swings. (AR 613.) Plaintiff was not agitated, anxious, or forgetful, but had poor attention span and concentration and poor judgment. (AR 613.) Plaintiff had normal language, knowledge, and insight. (AR 613.) Dr. Kifune prescribed Plaintiff Trazodone and Depakote. (AR 613.)

On October 13, 2011, Plaintiff reported that his depression symptoms were relieved by "conversing." (AR 615.) Plaintiff also complained of pain in his left ankle, which was relieved by physical therapy. (AR 615.) Dr. Kifune observed Plaintiff had a flat affect, but was negative for anhedonia. (AR 616.) Plaintiff was not agitated or anxious, and did not have pressured speech or suicidal ideation. (AR 616.) He had normal insight, judgment, attention span and concentration. (AR 616.)

Plaintiff's depression had "improved" on December 14, 2011, and he reported his symptoms were relieved by medication and he would be starting counselling that next month.

(AR 618.)  He reported dealing with "some stress due to issues with his siblings."  (AR 618.) Plaintiff had a flat affect, but was negative for anhedonia.  (AR 619.)  He was not agitated, anxious, or fearful, and denied hallucinations, hopelessness, mood swings, obsessive thoughts, and suicidal ideation.  (AR 619.)  He did not exhibit compulsive behavior. (AR 619.)  Plaintiff had normal knowledge, language, insight, and judgment, but had poor attention span.  (AR 619.) Plaintiff also complained of left ankle pain that radiated to his left knee, with aching and burning pain that is aggravated by walking and standing.  (AR 618.)  Plaintiff denied crepitus and limping.  (AR 618.)

On December 21, 2011, Plaintiff underwent imaging studies of his left ankle.  (AR 622.) The studies showed "old posttraumatic and perioperative change related to healed fracture of the fibula with hardware tracts in the tibia and fibula similar to the prior exam [on January 10, 2011 (AR 628)]."  (AR 622.)  No acute findings, spurring, or other degenerative change was shown. (AR 622.)

Plaintiff attended his two-month follow up appointment with Dr. Kifune on February 14, 2012, at which he reported experiencing "depressed mood and thoughts of death or suicide." (AR 681.)  Plaintiff also had "frequent issues with anger" of which he was not aware.  (AR 681.) On examination, Dr. Kifune observed Plaintiff had a normal affect and was not agitated, anxious, forgetful, or fearful, and did not exhibit compulsive behavior.  (AR 682.)  Plaintiff had normal knowledge, language, insight, judgment, attention span, and concentration, and behaved appropriately for his age.  (AR 682.)  He denied hopelessness, mood swings, memory loss, obsessive thoughts, paranoia, and suicidal ideation.  (AR 682.)

On March 27, 2012, Plaintiff reported feeling "anxious, fearful thoughts, depressed mood and thoughts of death or suicide and paranoia."  (AR 658.)  He was also "[e]asily angered and easily frustrated" and frequently had "very vivid dreams or nightmares."  (AR 658.)  Plaintiff was irritable with flat affect, but was not agitated or anxious, and behaved appropriately for his age. (AR 659.)  He denied hallucinations or flight of ideas, but had mood swings, paranoia, and poor insight.  (AR 659.)  Plaintiff did not exhibit compulsive behavior.  (AR 659.)

Plaintiff reported on April 24, 2012, that he "[s]till has occasional violent thoughts at

4

random intervals" that are "not driven by anything in particular." (AR 655.) He admitted to "fantasizing about hurting people at times," but did not focus on anyone in particular. (AR 656.) Dr. Kifune observed Plaintiff had an irritable affect, but was not agitated, anxious, forgetful, or fearful. (AR 656.) Plaintiff had normal knowledge, language, insight, attention span, concentration, and behaved appropriately for his age, but exhibited poor judgment. (AR 656.) He denied hopelessness, mood swings, memory loss, paranoia, and suicidal ideation, but admitted having obsessive thoughts. (AR 656.) Plaintiff reported on May 22, 2012, becoming "very angry" whenever he forgot to take his medication, Depakote, and that his medication relieved his symptoms. (AR 652.) Plaintiff reported his symptoms are "aggravated by conflict or stress at home or work." (AR 652.) He was diagnosed with post-traumatic stress disorder. (AR 653.)

On July 24, 2012, Plaintiff stated he felt counselling sessions have been "slowly helping anger management," and that he "[o]ccasionally has had thoughts of suicide but very rarely." (AR 648.) Plaintiff also complained of left ankle pain that is aggravated by movement and relieved by rest. (AR 648.) He reported that his ankle continued to swell at times and feels unstable. (AR 648.) On physical examination, Plaintiff had moderate swelling in his left lateral ankle and reduced range of motion. (AR 650.) Plaintiff's mental examination showed flat affect, but no agitation, anxiety, forgetfulness, or fearfulness. (AR 650.) Plaintiff had normal knowledge, language, insight, and judgment, but with poor attention span and concentration. (AR 650.) He denied hopelessness, mood swings, memory loss, paranoia, obsessive thoughts, and suicidal ideation. (AR 650.)

On August 7, 2012, Dr. Kifune completed an "Assessment of Ability to Do Work-Related Activities (Mental)" form. (AR 693–94.) Dr. Kifune assessed Plaintiff with chronic and acute PTSD, moderate to severe bipolar disorder, bilateral ankle damage, chronic back pain, and head trauma, ruling out PTSD due to encephalopathy. (AR 693.) He noted Plaintiff had problems with his occupation, finances, and social environment. (AR 693.) Dr. Kifune assigned Plaintiff a current Global Assessment of Functioning (GAF) score of 47, and noted Plaintiff's highest GAF score from the past year was 50. (AR 693.)

Dr. Kifune opined Plaintiff had a seriously limited ability to no useful ability to relate to

co-workers, no useful ability to deal with the public, a seriously limited ability to no useful ability to use judgment depending on the situation, and no useful ability to deal with work stressors. (AR 693.) He opined Plaintiff had seriously limited but not precluded ability to follow work rules, interact with supervisors, and to maintain attention and concentration. (AR 693.) Plaintiff had a limited but satisfactory ability to function independently. (AR 693.) Dr. Kifune opined Plaintiff would be absent from work two to three times a week due to his impairments or treatment. (AR 694.)

According to Dr. Kifune, Plaintiff had a seriously limited ability to no useful ability to understand, remember, and carry out complex job instructions, and a seriously limited ability to do the same for detailed, but not complex, job instructions so long as they were written. (AR 694.) Dr. Kifune rated Plaintiff's ability to understand, remember, and carry out simple job instructions as limited but satisfactory. (AR 694.) Dr. Kifune noted Plaintiff had a limited but satisfactory ability to maintain his personal appearance. (AR 694.) Plaintiff's ability to behave in an emotionally stable manner and to demonstrate reliability were rated as seriously limited but not precluded. (AR 694.) Dr. Kifune opined Plaintiff had a seriously limited ability to no useful ability to relate predictably in social situations. (AR 694.) He commented Plaintiff is "impulsive and explosive," and noted that while working for Job Connections that prior year, Plaintiff had a confrontation with a co-worker that resulted in Plaintiff yelling and walking off the job to avoid a physical altercation. (AR 694.) Dr. Kifune also noted Plaintiff is "[f]earful of not having self-control." (AR 694.)

Plaintiff reported on September 10, 2012, he stopped all medications the week prior due to gastrointestinal upset. (AR 645.) He was prescribed Seroquel. (AR 647.) On September 17, 2012, Plaintiff exhibited the "symptoms of a major depressive episode." (AR 643.) He reported Seroquel has caused "significant lethargy but has not helped anger issues." (AR 643.) Plaintiff had a flat affect, but was negative for anhedonia. (AR 644.) He was not agitated, anxious, or fearful, and denied hallucinations, hopelessness, mood swings, obsessive thoughts, and suicidal ideation. (AR 644.) Plaintiff had normal knowledge, language, attention span, and concentration, but had poor insight and judgment and "moderately impaired" short term memory.

(AR 644.)  He did not exhibit compulsive behavior.  (AR 644.)  Dr. Kifune recommended changing Plaintiff's medication to Seroquel-XR "in hope of slower release preparation not causing as much sedation."  (AR 644.)  Dr. Kifune also noted he hoped to "see some improvement in anger control with more time on the medication."  (AR 644.)

On September 21, 2012, Plaintiff stated Seroquel was causing a worsening of his symptoms, and he was prescribed Risperdal and Ativan instead.  (AR 854–55.)  Plaintiff's status was improved on September 25, 2012, particularly his anger issues, which "improved significantly with change in medication."  (AR 852.)  Plaintiff denied any medication side effects, had a normal affect, and was not agitated, anxious, forgetful, or fearful.  (AR 852–53.)  Plaintiff had normal knowledge, language, insight, judgment, attention span, and concentration.  (AR 853.)  He denied hopelessness, memory loss, obsessive thoughts, paranoia, and suicidal ideation. (AR 853.)  Dr. Kifune observed Plaintiff on November 26, 2012, as "gradual[ly] improv[ing]." (AR 846.)  Plaintiff reported his current medications "have helped to control anger outbursts better than prior [medications] without the sedation he had been experiencing."  (AR 846.) Plaintiff experienced suicidal ideation at times but had not acted on those thoughts in months. (AR 846.)

On December 3, 2012, Dr. Kifune wrote a letter stating Plaintiff was seen primarily for post-traumatic stress disorder and "a behavioral disorder which is poorly controlled by medical therapy."  (AR 704.)  Dr. Kifune wrote that Plaintiff has been "unable to maintain stable employment" and has been unemployed for several months "due to his inability to control his anger and frustration."  (AR 704.)  With respect to Plaintiff's treatment, which "combines medication and counseling," Dr. Kifune noted that Plaintiff "has been on several different medical regimens with sub-optimal results."  (AR 704.)  Although Plaintiff's current medical therapy seemed to afford him some improvement, Dr. Kifune noted Plaintiff's history that "any improvement in behavior has not been long lasting."  (AR 704.)  Dr. Kifune opined that counselling through behavioral health "needs to be a permanent part" of Plaintiff's treatment plan and he did not "foresee a permanent resolution of [Plaintiff's] health problem."  (AR 704.)  Dr. Kifune concluded that he supported Plaintiff's application for permanent disability.  (AR 704.)

On December 26, 2012, Plaintiff reported his medications "continue to help," although he was still having "anger outbursts where he breaks things at home, and experiences nightmares with significant sweating frequently." (AR 843.) Plaintiff told Dr. Kifune on January 23, 2013, he was experiencing more anxiety and stress as a result of his wife working more and having to take care of the children by himself. (AR 840.) He indicated he was drinking more as a result. (AR 840.) On examination, Dr. Kifune observed Plaintiff had an irritable affect, but was negative for anhedonia. (AR 841.) Plaintiff was agitated, anxious, and exhibited poor judgment, but had normal insight, attention span and concentration. (AR 841.)

Plaintiff's status was worsening on March 6, 2013, and he had the symptoms of a "major depressive episode." (AR 831.) His symptoms were aggravated by traumatic memories. (AR 831.) Dr. Kifune noted that Plaintiff had a flat affect and was positive for anhedonia, but was not agitated, anxious, forgetful, or fearful. (AR 832.) Plaintiff had normal knowledge, language, insight, judgment, attention span, and concentration. (AR 832.) He denied hopelessness, memory loss, hallucinations, paranoia, and suicidal ideation. (AR 832.). Plaintiff was also noted as being "[c]onstantly concerned about bad things happening to his family" and "dwells on physical abuse as a child." (AR 832.)

On March 30, 2013, Plaintiff reported feeling "stressed consistently due to caring for his children" and believed that two Lorazepam were "not as helpful as he would like," yet he was feeling "lethargic" and falling asleep at times during the day. (AR 828.) Dr. Kifune decreased Plaintiff's Risperidone dosage "due to lethargy" and increased his Lorazepam dosage for anxiety. (AR 828.) Plaintiff stated on April 3, 2013, that he feels "very anxious and stressed at home taking care of his children," but he denied any "temper outbursts or physical violence." (AR 825.) Plaintiff told Dr. Kifune he felt he needed "a little more sedation and help with sleep." (AR 825.) On April 24, 2013, Plaintiff's status had improved, and he reported he had not had any "significant emotional outbursts recently." (AR 822.) He did note he had been "much more sedated" as a result of the medication changes the prior month. (AR 822.)

On November 11, 2014, Dr. Kifune completed a "Physical Residual Functional Capacity

[“RFC”)][4] Questionnaire” as Plaintiff's medical provider for “over four years.”  (AR 881–85.)

Dr. Kifune diagnosed Plaintiff with PTSD, anxiety, ankle pain, and low back pain.  (AR 881.)

He noted that an x-ray showed a prior left ankle fracture.  (AR 881.)  Plaintiff's symptoms were

anger, insomnia, mood changes, and joint pain, while Dr. Kifune's clinical findings were

depression, irritability, memory loss, and anger.  (AR 881.)  Dr. Kifune responded Plaintiff's

emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations,

including depression, anxiety, and psychological factors.  (AR 882.)  He opined Plaintiff's

experience of pain or other symptoms were severe enough to frequently interfere with attention

and concentration needed to perform even simple work tasks during a typical workday.  (AR

882.)  Stress was noted to be a “major factor” in bringing on Plaintiff's symptoms, and Dr.

Kifune opined that Plaintiff was incapable of even “low stress” jobs due to his “very significant

negative reaction to stress.” (AR 882.)

Dr. Kifune opined that, if Plaintiff were placed in a “competitive work situation,” Plaintiff

could walk two city blocks without rest, could sit for one hour at one time, could stand for 30

minutes at one time, could stand and walk less than two hours in an eight-hour workday, and

could sit for about two hours in an eight-hour workday.  (AR 882–83.)  According to Dr. Kifune,

Plaintiff required a job that permitted shifting positions at will from standing, standing, or

walking, and that Plaintiff sometimes needed to take unscheduled breaks of 15 to 30 minutes

every two to three hours of an eight-hour workday.  (AR 883.)  Plaintiff did not need a cane or

other assistive device to stand or walk.  (AR 883.)

Dr. Kifune found that Plaintiff could occasionally lift 10 pounds and rarely 20 pounds.

(AR 884.)  Plaintiff could rarely twist, stoop, crouch, and climb stairs, and could never climb

ladders.  (AR 884.)  He had no limitations in repetitive reaching, handling, or fingering.  (AR

884.)  Dr. Kifune opined that Plaintiff would likely be absent from work as a result of his

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  “In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'”  *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

impairments more than four days per month. (AR 885.) According to Dr. Kifune, Plaintiff's onset date of the opined limitations was "over [ten] years" ago. (AR 885.)

On December 12, 2014, at Dr. Kifune's request, additional imaging studies were conducted of Plaintiff's ankle, which showed removed hardware and old healed fractures, but otherwise "no unfavorable change" and "stable" results. (AR 902.) Imaging studies of Plaintiff's lumbar spine were also performed that day, which showed normal bodies and disc spaces, normal alignment, normal posterior elements and joints, normal soft tissue planes, and an overall negative study. (AR 901.)

On December 8, 2015, Dr. Kifune wrote a letter in support of Plaintiff's application for disability benefits, noting that Plaintiff has "significant emotional and psychiatric disability stemming from past history of physical and emotional abuse." (AR 899.) Dr. Kifune wrote that Plaintiff "suffers from bipolar disorder and post-traumatic stress and likely has a component of organic brain syndrome as well." (AR 899.) Dr. Kifune concluded that he did "not feel Plaintiff is employable as his social skills are almost non-existent." (AR 899.)

### 2. Therapist Janet Black, L.C.S.W.

On June 5, 2012, Plaintiff attended a therapy session with Ms. Black. (AR 738–40.) She observed Plaintiff appeared to be "less guarded" with some anxiety and agitation. (AR 738.) Plaintiff reported that he had not been taking his medication for two days due to stomach upset, and then forgot to take them on the third day, when he accompanied his son on a school field trip. (AR 738.) Plaintiff recounted that the field trip was "very overwhelming" and that he got "really angry" at people there. (AR 738.) He was able to focus on his son and his friend, which "kept [him] under control," but later at home he got into a "big argument" with his wife. (AR 738.) Plaintiff also recounted to Ms. Black how he was upset with his mother that his sister was moving in with her. (AR 738.) Ms. Black advised Plaintiff to continue to take his medications and to eat crackers to help stomach upset. (AR 739.)

Plaintiff reported on June 19, 2012, "feeling better" but "kind of stressed" due to an impending visit from his biological father. (AR 735.) He had "high hopes that it will go well." (AR 735.) Plaintiff informed Ms. Black that he had a "really good father's day," on which he

went fishing with his family, and that he planned to take his kids swimming that next day. (AR 735.) Although Plaintiff reported that he was getting "frustrated" with parenting, Ms. Black noted that "it appears [Plaintiff] does pretty well" with his kids. (AR 735.)

On June 26, 2012, Plaintiff presented with a "labile" mood. (AR 732.) He told Ms. Black that he cannot visit his mother because he knows he'll "get into it" with his sisters and their boyfriends, whom he believes are just "using" his mom for a place to live. (AR 732.) Plaintiff reported on July 11, 2012, "looking forward" to going camping, commenting that "I'll be in the woods fishing most of the time, it'll be all good, plus my friends will be with me." (AR 726.) He also noted to Ms. Black that he was experiencing conflict in his marriage with respect to intimacy, but that he "loves her [and] wants to make it work." (AR 726.)

On July 19, 2012, Plaintiff presented to Ms. Black with "pressured speech" and was "very interactive." (AR 723.) He reported two incidents where he was able to walk away from an altercation without physical violence. (AR 723.) Ms. Black noted that Plaintiff appeared to be getting out into the public more recently. (AR 723.) Plaintiff also expressed the concern that his two-year-old child is bipolar. (AR 724.)

Plaintiff saw Ms. Black for a therapy session on July 26, 2012. (AR 720–21.) He was agitated, "irritable, tense, and tearful [at] times." (AR 720.) He reported having had a "really bad week," being "really depressed" and "sleeping a lot." (AR 720.) Plaintiff stated he was worried about his mother, who informed him she had a blockage in her heart, and what he would do were she to die. (AR 720.) Ms. Black observed that Plaintiff was "[v]ery dependent" on his mother and took care of her. (AR 720.) Plaintiff indicated he planned to visit his best friend in the coming weekend. (AR 721.)

On July 31, 2012, Plaintiff presented to Ms. Black "really stressed" due to the possibility of losing his car insurance as a result of the payment being due the same day his wife receives her "monthly money." (AR 717.) Plaintiff reported on August 7, 2012, that while fishing in a boat his left leg "went numb" such that he "couldn't move it or anything." (AR 706.) He told Ms. Black he was in "a lot of pain" both in his legs in back, but nevertheless he "still had fun—it was a good day." (AR 706.)

Plaintiff presented as "less agitated" on October 2, 2012. He reported to Ms. Black that the medications are "helping" but that he still stays away from people. (AR 803.) Plaintiff took his kids swimming and "had a good time." (AR 803.) He did "o.k." taking care of the kids while his wife was gone over the weekend working. (AR 803.) Plaintiff reported at his therapy session on October 16, 2012, his wife is working weekends and as a result he has responsibility for his children from 2:30 p.m. to 11:30 p.m. (AR 800.) He told Ms. Black that the responsibility it "stressful" but he is "working on it." (AR 800.) On November 6, 2012, Plaintiff reported that his "new medications are working better than the [D]epakote." (AR 794.)

On November 27, 2012, Ms. Black wrote a letter to Plaintiff's attorney. (AR 696.) In it, Ms. Black stated that she has seen Plaintiff for approximately 25 sessions since May 8, 2012. (AR 696.) She reported that Plaintiff "continues to struggle with symptoms of Post-Traumatic Stress Disorder," including difficulty falling and staying asleep, "severe nightmares and terrors." (AR 696.) Plaintiff wakes up "totally wet from sweating so much during a nightmare (or terror incident)." (AR 696.) Ms. Black wrote that Plaintiff "has had multiple traumatic events in his life since young childhood," including experiencing a "severe head injury at age 5 or 6" and other head traumas as a teenager as a result of "wresting, physical [altercations]." (AR 696.)

Ms. Black wrote of Plaintiff's statement that he was "expelled from all the schools in every district in Calaveras County" because teachers and janitors "couldn't handle [him] being open with [his] thoughts." (AR 696.) Plaintiff did ultimately receive a diploma through adult education at age 18 or 19 years old, but "[n]o class work or attendance was required," and there was "not much communication between teacher and [Plaintiff]," which is why he was able to accomplish it. (AR 696.) Ms. Black wrote that Plaintiff "appears to have increased difficulty being in public, in a crowd or a group of people." (AR 697.) He "[h]as a lot of difficulty with trust and is fearful that something is going to happen," and "[w]hen he feels threatened or his family is threatened, he will act accordingly to protect them," which "explains the Intermittent Explosive Disorder." (AR 697.) Ms. Black noted that Plaintiff "is very loyal and focused on protecting his family," which is "[p]ossibly due to the traumatic experiences in his childhood." (AR 697.)

Ms. Black diagnosed Plaintiff on Axis I with post-traumatic stress disorder, major depressive disorder, dysthymia, intermittent explosive disorder, and dyscalculia. (AR 697.) Plaintiff's Axis II diagnosis was mixed personality disorder, and he was assigned a GAF score of 50. (AR 697.) Ms. Black observed Plaintiff "struggles when he is around people other than his family," and opined that "between the PTSD and the Major Depression, he is unable to work in any type of occupation." (AR 697.) She stated that Plaintiff's "symptoms interferes with his learning and retention of new information and his hypervigilance and increased worrying about being safe prevents him from focusing and staying on task to complete any task consistently." (AR 697.) Ms. Black concluded by writing "I appreciate you also considering my perception in his case to support that [Plaintiff] meets the diagnostic criterion for Federal Disability." (AR 697.)

On December 18, 2012, Plaintiff presented to his therapy session with Ms. Black as "happy." (AR 773.) He reported that it was his daughter's third birthday and "we're all excited." (AR 773.) Plaintiff commented that he had had "a pretty good week." (AR 773.) On January 15, 2013, Plaintiff reported having "intense dreams" again and feeling unable to be a good father. (AR 767.) He also reported that his wife had increased her work days to four days a week, which would "affect the rent and cash aid." (AR 768.) Plaintiff told Ms. Black that his "sleeping pill isn't strong enough." (AR 768.)

Plaintiff was "tired and tearful" on January 22, 2013. (AR 764.) He reported having more difficulty parenting now that his wife was working four days a week and being afraid of "not knowing what to do with the kids if something happens." (AR 764.) Plaintiff told Ms. Black that he "had to take a couple of shots" of alcohol at noon one day "to feel right" and that he had been drinking every day. (AR 764.) Plaintiff reported that his "meds aren't working as well." (AR 765.) On February 5, 2013, Plaintiff presented to Ms. Black as more rested and less agitated. (AR 758.) He reported that his new medication schedule was "better" and that he was "getting more comfortable" taking care of his children. (AR 758.)

Plaintiff presented to Ms. Black on February 26, 2013, as "very tired," "robotic like," and "guarded" at times. (AR 755.) He reported taking his morning dosage of Risperidone and

Lorazepam and it made him "very sleepy." (AR 755.) Plaintiff noted that although the kids "wear [him] out," he's "getting better" at parenting, yet he still worries what he would do if there were an accident, as he has no cell phone or car to transport the children to the hospital. (AR 755.) He reported spending time with his older sister and her children and going to a movie with his wife, which "helped his attitude a little bit." (AR 755.)

On April 9, 2013, Plaintiff reported to Ms. Black that his wife broke her wrist while jumping a fence, causing her to work the "graveyard shift," which was "easier" on him. (AR 745.) He told Ms. Black he was "[g]etting used to being a single parent," and that recently he had been around other people with only some, but "not much," anxiety. (AR 745.) On November 18, 2013, Ms. Black wrote that she had referred Plaintiff to John Tim Rourke, Ph.D. to assist with treatment and to "assist with [Plaintiff's] appeal" of his denial of disability benefits. (AR 874.)

On November 11, 2014, Ms. Black completed a "Mental Impairment Questionnaire" co-signed by Dr. Kifune. (AR 876–80.) Plaintiff was diagnosed on Axis I with "postconcussion [sic] syndrome" and post-traumatic stress disorder. (AR 876.) Plaintiff's Axis II diagnosis was narcissistic personality disorder, and he was diagnosed on Axis III with a head injury and "back and leg issues." (AR 876.) Plaintiff was assigned a GAF score of 53. (AR 876.) Plaintiff was listed as having been prescribed Risperidone, Lorazepam, Abilify, Trazodone, Hydrocodone, and Ibuprofen, and was noted as compliant with his treatment and responding appropriately. (AR 876.) Noted side-effects from the medication were dizziness or drowsiness at times. (AR 876.) Plaintiff's prognosis was rated as "poor" due to "severity of head trauma." (AR 876.) Plaintiff's symptoms were noted as including anhedonia, decreased energy, feelings of guilt, impaired impulse control, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, recurrent obsessions or compulsions, emotional withdrawal, hyperactivity, emotional lability, flight of ideas, vigilance and scanning, pressured speech, easy distractibility, and sleep disturbance with nightmares and night sweats. (AR 877.)

Plaintiff was not noted as having a "low IQ or reduced intellectual functioning." (AR 878.) He had moderate limitation in activities of daily living and marked limitation in maintaining social functioning. (AR 878.) Plaintiff's concentration, persistence, and pace were

moderately to markedly limited, in that he needed to write down what he needed to do every day. (AR 878.) He was noted to have four or more repeated episodes of decompensation with a 12 month period, each of at least two weeks' duration, but later was noted to have only three episodes within 12 months lasting only hours. (AR 879.) It was estimated Plaintiff would be absent from work more than four days per month as a result of his impairments. (AR 879.) Other limitations noted were that Plaintiff reports his "legs give out" and he is "not able to maintain momentum." (AR 880.) It was recommended that Plaintiff be referred to a neurologist for his complaints of numbness in his feet and legs and "sharp pain" in his lower back. (AR 880.)

In February 2016, Ms. Black wrote that Plaintiff's behaviors have "become more aggressive within the past [five] months" and that six months ago he was "overwhelmed and depressed" due to his wife having had surgery for cancer and a wildfire causing his evacuation from his home. (AR 906.) According to Ms. Black, Plaintiff reported feeling "more tired and angry" since "changes" in his medications, and that he and Dr. Kifune were working together to get his medications "more balanced with the goal of decreasing adverse reactions." (AR 906.)

### 3. State Agency Physicians

On February 24, 2012, A. Nasrabadi, M.D., a state agency physician, reviewed the record and assessed Plaintiff's physical RFC. (AR 199–200.) Dr. Nasrabadi and found that Plaintiff could (1) occasionally lift and/or carry 10 pounds and frequently 10 pounds; (2) stand and/or walk for four hours in an eight-hour workday; (3) sit for about six hours in an eight-hour workday; and (4) perform unlimited pushing/pulling with the upper and lower extremities, subject to the lift and carry restrictions. (AR 199–200.) Dr. Nasrabadi found that Plaintiff had no other limitations. (AR 200.) Upon reconsideration on October 24, 2012, another state agency physician, J. Linder, M.D., reviewed the record and affirmed Dr. Nasrabadi's findings. (AR 210, 212–213.)

On October 31, 2012, medical consultant John Harper, M.D., completed a "Review of Physical Residual Functional Capacity Assessment" form, in which he agreed with the conclusions reached by Drs. Nasrabadi and Linder. (AR 678–79.) Specifically, Dr. Harper found that the limitations opined by Drs. Nasrabadi and Linder were "reasonable and supported by

evidence in the file," that the physicians "discussed alleged or documented symptoms and assessed symptom-related limitations," and that they "discussed all relevant treating or examining source statements." (AR 678.)

State agency physician R.E. Brooks, M.D., reviewed the record and assessed Plaintiff's mental RFC on February 27, 2012. (AR 200–202.) Dr. Brooks opined that Plaintiff was capable of performing simple, repetitive, tasks with no public contact. (AR 202.) Upon reconsideration on October 26, 2012, another state agency physician, A. Garcia, M.D., reviewed the record and affirmed Dr. Brooks' findings. (AR 210, 214.)

On October 31, 2012, psychiatric medical consultant R. Warren, M.D., completed a "Review of Mental Residual Functional Capacity Assessment" form, in which he found that Plaintiff has the ability to: understand and remember simple instructions; attend and concentrate for periods of two hours as is required in the workplace; interact appropriately with peers and supervisors; adapt to routine workplace changes. (AR 676–77.)

### 4. Consultative Examiner John Tim Rourke, Ph.D.

On November 26, 2012, psychologist Dr. Rourke authored a report detailing his examinations of Plaintiff that took place for approximately five hours on October 19 and November 3, 2012, at the recommendation of Dr. Kifune and Ms. Black. (AR 698–702.) Plaintiff was noted to have "social apprehension and neuromuscular signs of tension in social settings and apprehension in verbal communication." (AR 699.) He demonstrated "repeated difficulty with self-doubt, sadness, and frustration," symptoms that Dr. Rourke observed were "highly suggestive of depression." (AR 699.) Dr. Rourke noted Plaintiff's reports of growing up in a "difficult family situation" and was exposed to domestic violence. (AR 699.) Dr. Rourke observed that "[s]igns and suggestion of anxiety are severe." (AR 699.) He noted that Plaintiff had difficulty with times tables and division indicative of dyscalculia. (AR 699.) Dr. Rourke also noted that Plaintiff's apparent "traumatic open head injury" sustained when he hit his head on a mental trampoline frame also further "complicat[es] the clarification of [Plaintiff's] subjective distress and dysfunction." (AR 699.)

On mental status examination, Plaintiff was grossly oriented to person, place, times, and

situation.  (AR 700.)  He was "pleasant and cooperative" and his appearance "unremarkable." (AR 700.)  Dr. Rourke observed Plaintiff was "guarded" with "flattened affect" and his speech soft and slightly slurred.  (AR 700.)  Plaintiff's mood was "mildly sullen" and "slightly dysphoric" suggesting dysthymia.  (AR 700.)  He denied hallucinations and his sensorium was "seemingly realistic."  (AR 700.)  Dr. Rourke noted Plaintiff's short-term memory was mildly to moderately impaired and "no distinct episodes of anger or mood lability were directly observed." (AR 700.)  Plaintiff denied personal chemical dependency.  (AR 700.)

Dr. Rourke found the results of Plaintiff's neuropsychological testing suggested "problems with short-term memory retentional process, impulsivity and impairments of sequencing that interfere with [Plaintiff's] adaptive problem solving."  (AR 700.)  Plaintiff's arithmetic calculation scores "demonstrated a significant level of impairment suggesting a dyscalculia learning disorder."  (AR 700.)  Plaintiff performed adequately on the Bender Visual Motor Gestalt Test, but it showed "mild grapho-motor impairment consistent with his anxiety findings."  (AR 700.)  Dr. Rourke observed indications of "mild simplification, impulsivity and collision tendency" in Plaintiff's record, and noted a "mild organic impairment was suggested beyond the previously mentioned anxiety signs."  (AR 700.)  Testing criterion for the diagnosis of AD/HD was not found, but the results were positive for impulsivity and aggressive proneness. (AR 701.)

Dr. Rourke also found Plaintiff had the indications for a "mild, yet pervasive organic impairment effecting visual reproduction, cognitive switching and sequencing," and noted that Plaintiff suffered from "marked emotional impairment" in both depression and anxiety relative to past life trauma.  (AR 701.)  Plaintiff was noted as being "moderately depressed (non-suicidal) and severely anxious."  (AR 701.)  Dr. Rourke deemed Plaintiff "behaviorally and emotionally compromised by this behavioral disinhibition like condition," which in his opinion "produces profound and negative effects on [Plaintiff's] self-perception, ability to socially affiliate and overall sense of emotional security and safety."  (AR 701.)

Dr. Rourke assessed Plaintiff Axis I diagnoses of chronic post-traumatic stress disorder, moderate major depressive disorder, dysthymia, intermittent explosive disorder, and suggested

dyscalculia. (AR 701.) Plaintiff was diagnosed on Axis II with mixed personality disorder with severe avoidant and dependent symptoms, and suggested, but not documentarily confirmed medically, post traumatic encephalopathy on Axis III. (AR 701.) Dr. Rourke assigned Plaintiff a GAF score of 50. (AR 702.)

Dr. Rourke concluded Plaintiff was "seen as manifesting moderate to severe levels of acute and chronic depression as well as severe levels of anxiety (both in the form of social apprehension and trauma related anxiety)." (AR 702.) He recommended further medication management, found that a mathematic learning disorder was "indicated," and noted that a diagnosis of an organic mental disorder could not medically confirmed, despite Plaintiff manifesting possible symptoms. (AR 702.) Dr. Rourke found Plaintiff's prognosis was "guarded" due to the "intensity and severity of his subjective distress and objective behavioral dyscontrol." (AR 702.) He opined that Plaintiff's level of distress and dysfunction is sufficient to expect that he will not meaningfully improve sufficiently for gainful employment for at least a year, and that his level of impairment is such that Dr. Rourke "sees [Plaintiff] as meeting the diagnostic criterion for federal disability." (AR 702.)

### 5. Consultative Examiner Les P. Kalman, M.D., Psy.D.

Psychiatrist Dr. Kalman reviewed Plaintiff's medical records and performed a psychological evaluation of Plaintiff on October 25, 2013. (AR 863–67.) Plaintiff complained of suicidal thoughts, depression, PTSD, and anxiety. (AR 863.) He reported being beaten by his mother's boyfriends until the age of 12 and had flashbacks and nightmares of those events. (AR 863.) Plaintiff acknowledged feelings of worthlessness, helplessness, and suicidal thoughts. (AR 863.) He described his symptoms of "borderline personality with self injurious behavior, quick to anger, moody, agitated, with chronic empty feelings." (AR 863.)

Plaintiff completed high school through a continuation program, and claimed he was expelled from regular school because "I couldn't handle my mood and attitude." (AR 864.) He had "a lot of outbursts, fights, and was a slow learner." (AR 864.) Plaintiff denied drug use but admitted to drinking as recently as the night before, when he consumed five shots of rum. (AR 864.) Dr. Kalman assessed Plaintiff's medical history as status post fractured ankles, left leg with

screws in it from a skateboard accident and status post head injury with post concussive syndrome.  (AR 864.)

Upon mental status examination, Plaintiff was cooperative, his speech was of average rate and volume, and his eye contact was good.  (AR 864.)  He was alert and oriented to person, place, and situation, but did not know the date.  (AR 864.)  He was able to recall one of three objects at five minutes, to repeat four digits forward and three backward, to perform "serial 3's" with no errors, to add, subject, and multiply, and to recall one of the past five presidents.   (AR 864–65.)  Dr. Kalman rated Plaintiff's intelligence at below average.  (AR 864.)  Plaintiff's abstractions were intact, but he had poor insight into his mental illness and his judgment was poor.  (AR 865.)  Dr. Kalman noted that Plaintiff's "poor performance on the cognitive functioning scale may in part be due to the head trauma which he suffered in early childhood."  (AR 865.)

Dr. Kalman observed Plaintiff's mood was depressed and his affect "constricted."  (AR 865.)  Plaintiff admitted to suicidal thoughts and denied homicidal thoughts.  Plaintiff's form of thought was logical and goal directed, with no loose assertions, mood swings, or emotional lability.  (AR 865.)  Plaintiff did not report any hallucinations, but he "readily acknowledged" paranoid feelings.  (AR 865.)  With respect to present daily activities, Plaintiff reported that he does not do his own shopping, cooking, or housekeeping, tries to avoid crowds, cannot manage his own transportation, and does not pay his own bills.  (AR 865.)  Plaintiff reported that he is capable of caring for his own personal hygiene.  (AR 865.)   According to Plaintiff, he is estranged from his family and has one friend.  (AR 865.)  Plaintiff reported that on a typical day he smokes cigarettes, picks up kids, watches television, and feels like something bad will happen if he goes outside.  (AR 865.)

Dr. Kalman diagnosed Plaintiff on Axis I with schizoaffective disorder, post-traumatic stress disorder, cognitive disorder (status post head trauma), and alcohol abuse.  (AR 866.)  Plaintiff's Axis II diagnosis was borderline personality disorder, and he was assigned a GAF score of 50.  (AR 866.)  Dr. Kalman concluded Plaintiff's condition was not expected to improve significantly in the next 12 months, and that he was not competent to manage his own funds.  (AR 866.)

Dr. Kalman found Plaintiff had markedly limited ability to: understand, remember, and carry out detailed (3 or more steps) instructions or tasks; work in coordination with or in proximity to others without being unduly distracted by them; and get along with coworkers or peers without distracting them or exhibiting behavioral excesses. (AR 868–70.) Plaintiff had moderate limited ability to: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance from supervisors; and set realistic goals or make plans independently of others. (AR 868–70.) Dr. Kalman opined Plaintiff had mild limitations in his ability to: remember locations and work-like procedures; sustain an ordinary routine without special supervision; make simple work-related decisions; respond appropriately to expected and unexpected changes in the work setting; and travel in unfamiliar places or use public transportation. (AR 868–70.) Plaintiff's ability to interact appropriately with the general public or customers and to accept instructions and respond appropriately to criticism from supervisors was extremely limited. (AR 868–70.) Plaintiff had no significant limitation in his ability to: understand, remember, and carry out very short and simple repetitive instructions and tasks; maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and take appropriate precautions. (AR 868–70.)

Dr. Kalman found the following "work-related stressors" would "increase the level of impairment" beyond that which he had already identified: unruly, demanding, or disagreeable customers, even on an infrequent basis; production demands or quotas; a demand for precision; and a need to make accurate, independent decisions in problem solving on a consistent basis. (AR 870.) A routine, repetitive, simple, entry-level job was not deemed to be a stressor for Plaintiff. (AR 870.) He opined Plaintiff would likely be absent from work as a result of his impairments five days or more a month. Dr. Kalman also found that Plaintiff would likely be unable to complete an eight-hour workday five days or more a month. (AR 870.)

On March 13, 2015, Plaintiff underwent a second consultative psychological evaluation with Dr. Kalman. (AR 887–90.) Dr. Kalman observed Plaintiff's posture and gait were normal and there were no involuntary movements noted. (AR 887.) Plaintiff complained of "[j]ust everyday life, bad thoughts." (AR 863.) He reported having suicidal thoughts since he was little and that he made attempts but was never hospitalized. (AR 887.) Plaintiff also reported authority and visual hallucinations, including "seeing signs of animals that are not there." (AR 887.) According to Plaintiff, he stopped working in 2008 due to "depression and the inability to function." (AR 888.) He was jailed once for assault. (AR 888.) Plaintiff reported drinking two shots of Bacardi every other day. (AR 888.) Upon mental status examination, Plaintiff was cooperative, his speech was of average rate and volume, and his eye contact was fair. (AR 888.) He was alert and oriented to person, place, date and situation. (AR 888.) He was able to recall one of three objects at five minutes, to repeat three digits forward and two backward, to perform "serial 3's" with no errors, to add, subject, and multiply, and to recall one of the past five presidents. (AR 888.) Dr. Kalman rated Plaintiff's intelligence at average. (AR 888–89.) Plaintiff's abstractions were intact and his proverb interpretation fair, but he had poor insight into his mental illness and his judgment was poor. (AR 889.)

Dr. Kalman observed Plaintiff's mood was anxious, irritable, and depressed and his affect labile. (AR 889.) Plaintiff admitted to suicidal thoughts and denied homicidal thoughts, but admitted aggressive thoughts and behavior. Plaintiff's form of thought was logical and goal directed, with no loose assertions and mood swings, but positive for emotional lability. (AR 889.) Plaintiff admitted to auditory and visual hallucinations unrelated to mood, but no delusions. (AR 889.) With respect to present daily activities, Plaintiff reported that he does not do his own shopping, cooking, or housekeeping, cannot manage his own transportation, and does not pay his own bills. (AR 889.) Plaintiff reported that he is capable of caring for his own personal hygiene. (AR 889.) According to Plaintiff, he gets along with his girlfriend and has one friend. (AR 889.) Plaintiff reported that on a typical day he gets up around 10 a.m., watches television, "[c]hill[s] all day," takes a sleeping pill and goes to sleep. (AR 889.)

Dr. Kalman observed Plaintiff was "somewhat restless" during the interview. (AR 890.)

Plaintiff "has a long history of trauma stemming from childhood and traumatic brain injury." (AR 890.) Dr. Kalman noted because Plaintiff has a "very short temper and gets irritated easily," he struggled in school, was expelled, and has a legal history. (AR 890.) He observed Plaintiff "has difficulty dealing with people and maintaining employment," and noted Plaintiff's reports of feeling depressed, suicidal, and experiencing hallucinations. (AR 890.) Dr. Kalman's opinion was that Plaintiff is not able to interact with supervisors and co-workers; not able to deal with the public; able to understand, remember, and carry out simple one and two-step job instructions; cannot maintain attention, concentration, and memory; and has limited ability to withstand the stress and pressures associated with daily work activities. (AR 890.) Dr. Kalman diagnosed Plaintiff with schizoaffective disorder and intermittent explosive disorder, rule out alcohol abuse and antisocial personality disorder. (AR 890.) He concluded Plaintiff's condition was not expected to improve significantly in the next 12 months, and that he was not competent to manage his own funds. (AR 890.)

In the "Ability to Do Work-Related Activities (Mental)" questionnaire completed that same day, Dr. Kalman opined Plaintiff had no useful ability to understand, remember, and carry out complex instructions, and to make judgments on complex work-related decisions. (AR 891–92.) Plaintiff was noted as having substantial loss in his ability to interact with the public, supervisors, and coworkers. (AR 892.)

**B.      Plaintiff's Statements**

On January 20, 2012, Plaintiff completed an Adult Function Report. (AR 403–10.) He stated he lives in an apartment with family members. (AR 403.) When asked to describe what he did from the time he wakes up to the time he goes to bed, Plaintiff reported he takes his medications, tries his best to help his girlfriend with their children, cleans up around the house until "the pain sets in or until I get mad," and then watches television or naps. (AR 403.) Plaintiff stated that he sometimes walks his children to school and then climbs into bed because he is "drained of energy" and his legs are swollen and hurting. (AR 403.) He helps his girlfriend[5] take care of his three children but she "pretty much does everything." (AR 404.)

_____

[5] Plaintiff refers to his companion both as his "wife" and as his "girlfriend."

Plaintiff reported that insomnia and "severe pain" keep him from sleeping.  (AR 404.)  He does not need any assistance with his personal care and needs no reminders to do so.  (AR 404.)  Plaintiff's girlfriend has to remind him every day to take his medication.  (AR 405.)

Plaintiff heats up a "Hot Pocket" or leftovers in the microwave about two times a week, otherwise his girlfriend cooks his meals.  (AR 405.)  He vacuums, straightens up the living room every other morning for an hour, and sweeps the porch with encouragement.  (AR 405.)  Plaintiff reports that he tries to go outside every day and can do so by himself.  (AR 406.)  He walks and uses public transportation, but does not drive because he does not own a vehicle or license and also does not have the patience for it.  (AR 406.)  Plaintiff shops in stores for hygiene products and food with his girlfriend once a month for two to three hours.  (AR 406.)  He can pay bills with the assistance of his girlfriend, count change, and use money orders to pay bills.  (AR 406.)

Plaintiff's hobbies and interests include fishing, watching television, and playing his PlayStation.  (AR 407.)  He watches television every day, plays his PlayStation every other day, and goes fishing about three times a year.  (AR 407.)  Plaintiff reports that he calls his mother every morning and night and visits his only friend's house once a week.  (AR 407.)  He has to be reminded to attend doctor's appointments and to go to the pharmacy but can go by himself to those places.  (AR 407)  Plaintiff does not get along with his family, has only one friend, and is nervous to meet new people, as he does not like crowded places.  (AR 408.)  He has trouble walking, kneeling, squatting, standing and climbing due to the fact that he "severely broke" his ankle, which in turn injured his knees.  (AR 408.)  Plaintiff reports that he has stop walking after one city block due to pain in his legs and has to rest about five to ten minutes.  (AR 408.)

Plaintiff has difficulty completing tasks and if he doesn't "get the project quick, [he] destroys it, no matter what it is."  (AR 408.)  He can only pay attention for less than half an hour.  (AR 408.)  Plaintiff follows written instructions "down to the tee," but does not follow spoken instructions well.  (AR 408.)  Plaintiff has not been fired or laid off from a job because of problems getting along with other people.  (AR 409.)  He does not handle stress well and "struggle[s]" with changes in routine.  (AR 409.)  His ability to get along with authority figures "depends on how they treat [him,]" and his attitude "does get in the way."  (AR 409.)

Plaintiff completed another Adult Function Report on September 18, 2012.  (AR 430–38.)
He stated that he lives in an apartment with his girlfriend and children.  (AR 430.)  Plaintiff states
his ankle injuries limit his ability to pick up things from the ground, it gets swollen when standing
too long, and he is in severe pain most of the time.  (AR 430.)  According to Plaintiff, his mental
conditions are a burden in his relationship and social activities, and it is "very rare" that he has a
good day.  (AR 430.)  During a typical day, Plaintiff goes outside for a bit, plays with his
daughter and will care for her until her mother gets home.  (AR 430.)  During this time, he tries to
get some housework done and watches cartoons with his daughter.  (AR 431.)  Plaintiff calls his
mother more than 10 times a day to ask her questions while watching his daughter.  (AR 431.)
He cannot fall asleep until his brain is "exhausted," has "severe night sweats," and sometimes
experiences "agonizing" pain in his calf and ankle.  (AR 431.)  Plaintiff's condition does not
affect his personal care.  (AR 423.)  His girlfriend has to remind him to take his medication every
day or else he is "not a nice person."  (AR 432.)

Plaintiff is "very paranoid" about using the stove and oven.  (AR 432.)  He reports he will
cook himself a frozen pizza or other foods that can be heated in the microwave, otherwise he will
eat only sandwiches until his girlfriend returns home. (AR 432.)  Plaintiff cleans the living room,
does "a little dusting," and, "on a good day," does dishes until his "legs swell[] and ache[]."  (AR
432.)  It takes him four hours to perform these chores, which he performs every other day, with
encouragement.  (AR 432.)

Plaintiff goes outside every day, attends doctor's appointments once a month, attends his
counseling sessions once a week, and visits his friend two times a month.  (AR 433.)  He walks
and rides in a car driven by his girlfriend; he is "[t]errified to drive with others" and "never really
drove a lot."  (AR 433.)  Plaintiff shops in stores for "main necessities" every other month.  (AR
433.)  He can pay bills, count change, and use a checkbook or money orders.  (AR 433.)

Plaintiff's hobbies and interests include watching football and fishing.  (AR 434)  He goes
fishing about two times a year and watches football every Thursday, Sunday, and Monday,
totaling 267 football games in 16 weeks.  (AR 434.)  Plaintiff reports he talks to his mother on the
phone at least five times a day and visits his friend's house two times a month.  (AR 434.)  He

attends doctor's and counseling appointments, so long as it is written on a calendar. (AR 434.) Although Plaintiff does not need anyone to accompany him, he stated he feels more comfortable if someone he "trust[s]" is with him. (AR 434.) He reported he always fights with his sisters and tries to fight their boyfriends. (AR 435.) According to Plaintiff, his conditions affect his ability to lift, squat, bend, stand, walk, kneel, climb stairs, remember, concentrate, and get along with others. (AR 435.) He can walk one or two city blocks before he needs to rest for about five minutes. (AR 435.) Plaintiff stated he can pay attention between five and ten minutes. (AR 435.) He is "excellent" at following written instructions, but needs to be told spoken instructions three to four times before following them. (AR 435.) As long as authority figures are respectful to him, Plaintiff will be respectful to them, otherwise he will "beat the respect out of them." (AR 436.) He has "explosive reactions" to stress and is "lost" out of routine. (AR 436.) Plaintiff reported he fantasizes about harming others and is unable to handle his anger mood swings. (AR 436.) He takes medication, including his recently-switched medication of Seroquel XR, with no side effects. (AR 437.)

Plaintiff's journal of daily activities from September 27, 2013, to January 18, 2015, recounts him doing laundry, making beds, mopping floors, washing walls, going to the movies, going grocery shopping, going swimming, washing windows, taking his children to doctor's appointments and swimming, attending a family reunion, shopping for costumes for his children, attending his children's teacher meeting, helping with his son's project for school, attending meetings, attending his son's wrestling practices and tournament, helping his son sell See's Candies, attending his children's singing recital, helping his children count change, shopping for Christmas presents, visiting his mother, going to "Lawrence's" for dinner; taking his children outside to ride their bicycles, taking his children to the park, and cooking dinner (AR 499, 501, 503, 505, 507, 508, 509, 510, 511, 513, 514, 517, 521, 526, 527, 528, 531, 533, 535, 539, 540, 541, 542, 545, 547, 549, 550, 553, 556, 558, 559, 561, 562, 565, 569, 570, 571, 574, 576, 580, 581, 582, 583, 584, 585, 587, 588.)

**C.      Plaintiff's Girlfriend's Statements**

On January 20, 2012, Plaintiff's girlfriend Christina A. Carter completed a Third Party

Adult Function Report.  (AR 394–401.)  Ms. Carter reported that she has known Plaintiff almost 10 years and spends every day with him, playing with their children and watching television.  (AR 394.)   During a typical day, Plaintiff wakes up and Ms. Carter tells him to take his medication.  (AR 394.)  He then plays with his daughter, cleans the living room, and watches television.  (AR 394.)  Plaintiff helps Ms. Carter take care of their children, changes diapers and helps the older children get dressed.  (AR 395.)  According to Ms. Carter, Plaintiff "tosses and turns" all night complaining of pain, even after having taken a sleeping pill.  (AR 395.)  Ms. Carter reported that Plaintiff's condition does not affect his personal care.  (AR 396.)  She has to remind him to take his medication and attend his doctor's appointments.  (AR 396, 398.)

According to Ms. Carter, she makes all of Plaintiff's meals unless they can be cooked in the microwave because Plaintiff gets too frustrated to cook.  (AR 396.)  Plaintiff cleans the living room and vacuums every other day for an hour with Ms. Carter's encouragement.  (AR 396.)  Ms. Carter reported she tries to get Plaintiff outside every day and that he can go out alone.  (AR 397.)  Plaintiff walks and uses public transportation.  (AR 397.)  He does not have a license or a car and does not drive because he gets "very angry."  (AR 397.)  Ms. Carter reported Plaintiff shops in stores for hygiene products and food once a month for four hours.  (AR 397.)  He can pay bills and count change but cannot handle a savings account or use a checkbook/money orders.  (AR 397.)

Plaintiff's hobbies and interests include fishing, watching television, and playing his PlayStation.  (AR 398.)  Ms. Carter reported that Plaintiff plays his PlayStation every other day and watches television "all the time."  (AR 398.)  According to Ms. Carter, Plaintiff spends time with his family and "calls his mom every morning and night."  (AR 398.)  He is with his family "all the time."  (AR 398.)  Ms. Carter reported Plaintiff stays home unless he has a doctor's appointment.  (AR 398.)  Plaintiff "really only get [sic] along with his mom" and has one friend.  (AR 399.)  Ms. Carter stated that Plaintiff has to stop walking after one city block and has to rest about 15 to 20 minutes.  (AR 399.)

Plaintiff has difficulty completing tasks and he gets "very upset" if he concentrates too long.  (AR 399.)  He can only pay attention for less than half an hour.  (AR 399.)  According to

Ms. Carter, Plaintiff cannot get along with people. (AR 399.) Plaintiff follows written instructions "very well" and needs to be "shown what to do or have someone read it to him." (AR 399.) Plaintiff has not been fired or laid off from a job because of problems getting along with other people. (AR 400.) He does not handle stress or change well. (AR 400.) As far as getting along with authority figures, Ms. Carter stated it "depends on how these people treat him," i.e., if he feels they are being rude to him then he will reciprocate. (AR 400.)

Ms. Carter completed another Adult Third Party Function Report on September 18, 2012. (AR 420–28.) Ms. Carter reported that she has known Plaintiff seven years and spends every day with him. (AR 420.) Plaintiff is "very angry and moody" and cannot "be around a lot of people," as he gets angry and "has to leave." (AR 420.) During a typical day, Plaintiff wakes up, watches television "all day," goes outside or shopping with Ms. Carter, and watches his daughter until Ms. Carter returns home. (AR 421.) Plaintiff takes care of his daughter while she works. (AR 421.) Plaintiff has to talk to his mother on the phone more than 10 times while he watches his daughter. (AR 421.) Plaintiff has insomnia and gets up 20 times a night; his condition does not affect his personal care, except that Ms. Carter must remind Plaintiff to shave, brush his hair, and brush his teeth. (AR 421–22.) She has to remind him to take his medication every day. (AR 422.)

According to Ms. Carter, she makes all of Plaintiff's meals because Plaintiff "is not sure about using the stove." (AR 422.) Plaintiff takes the garbage out every other day at Ms. Carter's repeated instruction. (AR 422.) Ms. Carter reported Plaintiff goes outside when he has a doctor's appointment and to "hang out with our kids." (AR 423.) Plaintiff rides in a car and does not have a license or drive because he has had "road rage." (AR 423.) Plaintiff shops in stores for "the necessities" every other month for two hours, and can pay bills and count change. (AR 423.)

Plaintiff's hobbies and interests include watching television, teaching his daughter how to count and recite her "ABCs," and helping his son with his homework. (AR 424) Ms. Carter reported that Plaintiff does these things every day. (AR 424.) According to Ms. Carter, Plaintiff talks to his mother on the phone "at least 10 times a day." (AR 424.) Ms. Carter reported Plaintiff attends doctor's and dentist appointments. (AR 424.) Ms. Carter stated that Plaintiff

consults a calendar as a reminder to go places but does not need anyone to accompany him. (AR 424.) According to Ms. Carter, Plaintiff gets very irritated at parties or family get-togethers, as he feels a lot of anxiety and wants to "run or fight." (AR 425.)

Ms. Carter reports Plaintiff cannot be active outside because his ankle becomes "weak and numb." (AR 425.) He can walk one city block before he needs to rest for 30 minutes. (AR 425.) According to Ms. Carter, Plaintiff can pay attention for 30–40 minutes and can follow written instructions, but has to read them "at least 5 different time[s]." (AR 425.) He can follow spoken instructions so long as he is shown as well as told. (AR 425.) As long as authority figures are respectful to him, he will be respectful to them. (AR 426.) Ms. Carter reports Plaintiff has not been fired or laid off from a job because of problems getting along with other people. (AR 426.) He does not handle stress well and "gets angry and starts telling at everyone around him" and "shuts down" in response to changes in routine. (AR 426.) Ms. Carter reports Plaintiff takes medication but there are no side effects. (AR 427.) Ms. Carter writes that she is "emotionally abused every day" by Plaintiff, and that Plaintiff needs to "get on the right medication so this family can have some peace." (AR 427.)

**D.      Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on March 2, 2012, and again on reconsideration. (AR 254–58, 260–64.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 265–73.) A hearing was held on June 4, 2013, before an ALJ. (AR 56–131.) The ALJ issued a decision on September 4, 2013, finding Plaintiff not disabled. (AR 222–44.)

Plaintiff sought review of the ALJ's decision before the Appeals Council, which was granted. On January 26, 2015, the Appeals Council remanded the case to the ALJ to: obtain additional evidence concerning Plaintiff's impairments; obtain evidence from a medical expert to clarify the nature and severity of Plaintiff's mental impairment; give further consideration to Plaintiff's maximum RFC; and obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base, if warranted. (AR 250–52.)

Upon remand, on February 9, 2016, the ALJ conducted a second hearing. (AR 130–80.) At the hearing, Plaintiff appeared with counsel and testified before an ALJ as to his alleged disabling conditions. (AR 135–50.)

### 1. Plaintiff's Testimony at the June 2013 Hearing

Plaintiff testified about his symptoms and limitations at the hearing. Plaintiff stated he was on medication for his post-traumatic stress disorder and the medication helped. (AR 59.) On a typical day, he takes his medication and helps his children with their homework or plays with them. (AR 60.) To pass the time, he sleeps and plays his PlayStation about an hour before he has to stop. (AR 61, 66.) Plaintiff testified that he goes fishing every chance he gets and estimated he would go fishing about five times a month. (AR 61.) He fishes for "a couple of hours" before needing to stop. (AR 65.) Plaintiff first stated that he stands the whole time while fishing, although he later testified that he alternates between sitting and standing. (AR 65–66.)

Plaintiff testified he could only walk a quarter mile due to having had surgery in his left leg in 2009, and that he has pain in his left leg rated a "6" or "7" out of "10." (AR 61, 68.) He can only stand 5 to 10 minutes due to problems with his back and legs. (AR 61.) Plaintiff testified that he was not getting medical treatment for his back. (AR 62.) He cannot sit long because he cannot stay still. (AR 62.) Plaintiff testified he could lift about 50 pounds, since his daughter weighs that much and he can lift her. (AR 62.) He can pick her up and carry her around five times a day for about three minutes at a time. (AR 67.)

He stated his children stress him out and he did not believe that he would be able to care for them full time without his girlfriend's help. (AR 63.) According to Plaintiff, he only supervises them alone for two hours. (AR 63.) He spends his day "pacing back and forth in the house." (AR 65–66.) Plaintiff testified he experiences depression "all the time," and experiences anxiousness, sleepiness, anger, and fearsome thoughts. (AR 69.) He can count change but has problem with calculations and keeping track of time. (AR 69.) He has thoughts about hurting or killing others, and does not take criticism well. (AR 70.) He once "broke open his head" that required surgery, and has suffered severe migraines and short term memory

problems as a result. (AR 71.) According to Plaintiff, counselling is helping his symptoms and his medications help his outbursts. (AR 64, 70.) Plaintiff testified that he used to have severe nightmares and night sweats but the medication has helped. (AR 71.)

### 2. Plaintiff's Testimony at the February 2016 Hearing

Plaintiff also testified at a second hearing in February 2016. Plaintiff testified he was 27 years old at the time of the hearing. (AR 136.) He testified he "somewhat" had basic math skills, including multiplication and division. (AR 137.) According to Plaintiff, his supervisor at his prior workplace is now his "best friend." (AR 156.)

Plaintiff stated that his anger and "other people" are the primary reasons why it is difficult for him to work. (AR 138.) He experiences anxiety and panics when he is under pressure, causing him to hyperventilate and become angry. (AR 139.) Plaintiff testified he has insomnia and "severe dreams," and that he choked his girlfriend in his sleep. (AR 143.) He stated he has symptoms from post-traumatic stress disorder, including sleep disturbances and "anger all the time." (AR 143–44.) His anger causes him to "crash stuff, break stuff" and he does not like to be around people. (AR 144.) He gets into arguments with his girlfriend due to his mood swings. (AR 145.) According to Plaintiff, he would not be able to take criticism from a supervisor, just as he was not able to handle criticism from teachers at school, causing him to drop out. (AR 145.) He testified he could not perform any jobs full-time, even those simple and routine with no public interaction, due to his "anger [and] lack of motivation" and the fact that he does not get along with people and does not take criticism well. (AR 146–47.)

Plaintiff testified he stopped showing up for work because he "didn't like to go to work" and "didn't have the strength to get up" and go. (AR 141.) He lacked motivation to work and also could not lift more than 20 pounds due to a "severely" broken ankle. (AR 141.) According to Plaintiff, he continues to have "blood flow" problems with his ankle causing it to go numb and impeding his ability to lift and to walk long distances. (AR 142.) Plaintiff testified he has pain in his ankle "all the time," rated an "8" to a "10" out of "10." (AR 142.) He stated he has a "firm sock" he wears to put pressure on his ankle which gives him relief. (AR 150.) Plaintiff testified that he did physical therapy which he is trying to resume. (AR 150.)

Plaintiff has been seeing a counselor for five years, and testified that his sessions are helpful by allowing him to express his feelings. (AR 139–40.) He testified his counselor showed him "coping strategies" that work in addressing his stress, but that most of the time he reacts before he has a chance to think. (AR 148–49.) Plaintiff stated he nevertheless still has mood swings and "anger issues." (AR 139.) He takes medications for pain, which help. (AR 142.) Side effects from his medications include drowsiness. (AR 147.)

### 3. Medical Expert's Testimony at the February 2016 Hearing

Martin Cary, M.D., a clinical psychologist, testified at the hearing as a medical expert. (AR 150–71.) Dr. Cary identified Plaintiff's medically determinable impairments as depression, post-traumatic stress disorder (PTSD), and alcohol abuse that is currently in remission. (AR 159.) Dr. Cary opined that Plaintiff was probably exaggerating some of his symptoms, or "putting his worst foot forward," given the inconsistencies in the medical record. (AR 164–65.) Dr. Cary concluded that, based upon his review of the medical record, Plaintiff would be capable of performing simple, routine tasks with only occasional changes in work setting, occasional interaction with the general public, and occasional interaction with coworkers and supervisors. (AR 171.)

### 4. Vocational Expert's Testimony at the February 2016 Hearing

A Vocational Expert ("VE") testified at the hearing that Plaintiff had no past work. (AR 174.) The ALJ asked the VE to consider a person of Plaintiff's age and education, and with no past work, who is capable of performing at the sedentary level. (AR 174.) The VE was also to assume this person was limited to: work that is defined as "simple" by the Dictionary of Operational Titles ("DOT"), i.e., specific vocational preparation (SVP)[6] levels of 1 and 2; routine and repetitive tasks; occasional changes in the work setting; and occasional interaction with the general public, coworkers, and supervisors. (AR 175.) The VE testified that such a person could perform work as a hand bander, DOT code 920.687-030, SVP 2, of which there are 16,000 jobs

---

[6] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id.*

in the national economy. (AR 175.) The VE also testified that such a person could perform work as a bag cutter, DOT code 789.687-010, SVP 2, for which there are 8,500 jobs, and could also perform work as a final assembler (optical), DOT code 713.687-018, SVP 2, for which there are 7,000 jobs in the nation. (AR 175.)

In the next hypothetical, the VE was asked to consider this same first hypothetical person but include the additional limitation that the person would likely have three or more unexcused or unscheduled absence per month. (AR 175.) The VE testified that no jobs were available for that person. (AR 175.) For the third hypothetical, the VE was asked to consider the first hypothetical person but include the additional limitation that, due to a combination of medical conditions associated with pain and mental impairments, the person would be unable to engage in sustained work activity on a regular and continued basis for eight hours a day, five days a week for a 40 hour work week or equivalent schedule. (AR 176.) The VE testified that no jobs were available for that person. (AR 176.)

Plaintiff's counsel then asked the VE to consider the ALJ's first hypothetical person, with the additional limitation that, on at least two occasions during the first 30-day "probationary period," such person would "raise their voice" to say something "oppositional" to the supervisor when he/she gave criticism and perhaps "walk away and take a break" (AR 178.) The VE testified that such person was "likely to be viewed as an individual with some work adjustment problems" and "it is likely that they would not be able to maintain employment due to . . . those infractions." (AR 178.)

**E.     The ALJ's April 2016 Decision[7]**

In a decision dated April 20, 2016, the ALJ found that Plaintiff was not disabled. (AR 19–47.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920. (AR 22–47.) The ALJ decided that Plaintiff had not engaged in substantial gainful activity since October 31, 2011, the application date. (AR 22.) The ALJ found that Plaintiff had the severe impairments of (1) left ankle fracture post Open reduction Internal Fixation (ORIF); (2) obesity; (3) affective disorder; (4) bipolar disorder; (5) intermittent explosive disorder; (6) mixed

---

[7] The prior ALJ's decision that was reviewed by the Appeals Council is not summarized.

personality disorder; and (7) Post-Traumatic Stress Disorder.  (AR 22.)  However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  (AR 22–28.) The ALJ determined that Plaintiff had the RFC

> to perform sedentary work as defined in 20 CFR [§] 416.967(a) with the following limitations: is limited to work that is defined as simple by the [DOT], [SVP] levels 1 and 2, routine and repetitive tasks; should only involve occasional changes in the work setting; and should only have occasional interaction with the general public, coworkers, and supervisors.

(AR 28.)

The ALJ determined Plaintiff had no past relevant work, but that Plaintiff was not disabled because, given his RFC, he could perform a significant number of other jobs in the local and national economies, specifically hand bander, bag cutter, and final assembler (optical).  (AR 46–47.)   In reaching his conclusions, the ALJ also determined that Plaintiff's subjective complaints were "not entirely consistent with the medical evidence and other evidence in the record . . . ."  (AR 43.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on October 7, 2016.  (AR 1–15.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

### III.      SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  "Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.     APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)–(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work. *Id.* §§ 404.1520(f), 416.920(f). If

not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V. DISCUSSION

Plaintiff contends that the ALJ erred in three ways. First, Plaintiff claims the ALJ erred in his treatment of the opinions of Dr. Kifune, Ms. Black, Dr. Rourke, and Dr. Kalman. (*See* Doc. 19 at 11–17; Doc. 21 at 2–4.) Second, Plaintiff asserts that the ALJ improperly discounted Plaintiff's testimony regarding his subjective complaints based on his activities of daily living. (*See* Doc. 19 at 17–19; Doc. 21 at 4–6.) Finally, Plaintiff contends the ALJ's finding at Step Five is not supported by substantial evidence. (*See* Doc. 19 at 19–20; Doc. 21 at 6–7.)

Defendant counters that that the ALJ properly evaluated Dr. Kifune's, Ms. Black's, Dr. Rourke's, and Dr. Kalman's opinions, that the ALJ properly relied on evidence in the record that undermined the credibility of Plaintiff's allegations of disabling symptoms and limitations, and that the ALJ properly relied on the VE's testimony at Step Five. (*See* Doc. 20 at 7–14.)

## A. The ALJ Properly Found Plaintiff Less Than Fully Credible.

### 1. Legal Standard

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id.* As the Ninth Circuit has

explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226–27 (9th Cir. 2009). Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The clear and convincing standard is "not an easy requirement to meet," as it is "'the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Social Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). General findings are not sufficient to satisfy this standard; the ALJ "'must identify what testimony is not credible and what evidence undermines the claimant's complaints.'" *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

### 2.    Analysis

The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 43.) The ALJ also found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR 43.) Since the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the only remaining issue is whether the ALJ provided "specific, clear and convincing reasons" for Plaintiff's adverse credibility finding. *See Vasquez*, 572 F.3d at 591. Here, the ALJ found Plaintiff's credibility was undermined by several factors: the functional abilities he demonstrated in daily activities that

36

were in excess of his allegations of disability; his lack of compliance in taking prescribed medications that, when taken, helped control his symptoms; and evidence showing his mental symptoms were exacerbated by situational stressors rather than his medically determinable impairments. (AR 43–45.) The Court takes each finding in turn.

### a. Inconsistencies with Activities of Daily Living

The ALJ found that Plaintiff "has described activities of daily living that are not as limited as one would expect given [Plaintiff's] complaints of disabling symptoms and limitations." (AR 43.) It is appropriate for an ALJ to consider a claimant's activities that undermine claims of totally disabling pain in making the credibility determination. *See Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989); *Morgan v. Comm'r of Soc. Sec. Admin*., 169 F.3d 595, 600 (9th Cir. 1999); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) *See also Thomas v. Barnhart*, 278 F.3d 947, 958–59 (9th Cir. 2002) (An ALJ may support a determination that the claimant was not entirely credible by identifying inconsistencies between the claimant's complaints and the claimant's activities of daily living.). Notwithstanding, it is well-established that a claimant need not "vegetate in a dark room" in order to be deemed eligible for benefits. *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987). However, if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain. *Fair*, 885 F.2d at 603. "Even where [Plaintiff's daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012).

According to the ALJ, Plaintiff alleges he has difficulty completing tasks and can only pay attention for less than half an hour. (AR 43, 408, 435.) Plaintiff claims that he does not handle stress well, sometimes resulting in "explosive reactions," and is "lost" and "struggle[s]" with changes in routine. (AR 43, 409, 436.) The ALJ further notes that Plaintiff asserts he does not prepare meals except for using the microwave or preparing sandwiches. (AR 43, 405, 432, 865, 889.) He testified that he can only stand 5 to 10 minutes and cannot sit long because he

cannot stay still.  (AR 44, 61–62.)  Plaintiff also claims that he cannot have any public interaction and keeps himself locked in his house (AR 44, 144, 146–47, 408, 410).

However, in evaluating Plaintiff's credibility, the ALJ cited activities of daily living that were inconsistent with Plaintiff's testimony concerning the severity of his symptoms and impairments.  The ALJ noted, and the record reflects, that Plaintiff lives in an apartment with his family, which includes his girlfriend and their children.  (AR 26, 43, 403, 430.)  While his girlfriend works, Plaintiff will sometimes take care of his daughter during the week and of all three children from 2:30 p.m. to 11:30 p.m. on weekends.  (AR 24, 25, 33, 39, 41, 43, 421, 800.)  He changes his daughter's diapers, plays with her, and enjoys teaching her how to count and to recite her ABCs.  (AR 24, 26, 27, 43, 60, 394, 395, 424, 430.)  Plaintiff testified at the June 2013 hearing that he lifts and carries his daughter, who weighs about 50 pounds, five times a day for about three minutes at a time.  (AR 23, 33, 67.)  The record shows that Plaintiff walks the older children to school, helps get them dressed, and assists his son with his homework.  (AR 23, 24, 25, 26, 32, 33, 39, 60, 395, 403, 424.)  Plaintiff served as a chaperone as his son's field trip, helped his son sell See's Candies, attended a singing rectal and his son's wrestling practices and tournaments.  (AR 25, 27, 33, 34, 41, 42, 495–588, 738.)  He takes the children to their doctor's appointments and to the park, as recounted in his journal of daily activities.  (AR 25, 34, 39, 495–588.)  As the ALJ observed elsewhere in his decision, "there is no evidence that his children are truant or disciplined due to [Plaintiff's] inability to perform his duties of taking them to school or helping them prepare for school."  (AR 39.)  Medical expert Dr. Cary similarly noted at the February 2016 hearing that there was no indication in the record that Child Protective Services were called at any time while Plaintiff was parenting his children.  (AR 170.)

The ALJ noted Plaintiff needs no assistance taking care of his personal care needs.  (AR 43, 396, 404, 422, 421–22.)  He performs various tasks around the house, such as cleaning the living room, taking out the garbage every other day, washing dishes, vacuuming, sweeping the porch, and washing windows and walls.  (AR 23, 24, 25, 26, 32, 43, 394, 396, 403, 405, 422, 432, 495–588).  Plaintiff's journal reflects him cooking dinner.  (AR 495–588.)  Plaintiff enjoys watching television, including cartoons with his daughter.  (AR 27, 431.)  He indicated in his

Adult Function Report that during football season he watches football every Thursday, Sunday, and Monday, totaling 267 football games in 16 weeks.  (AR 32, 33, 434.)  Plaintiff also enjoys playing his PlayStation, which he does every other day.  (AR 24, 27, 398, 307, 61.)  He states in his Adult Function Reports he is "excellent" at following written instructions, which he does "down to a tee."  (AR 27, 43, 408, 435.  *See also* AR 398.)  Plaintiff is able to pay bills and count change.  (AR 25, 27, 39, 43, 397, 406, 423, 433.)

The record shows Plaintiff uses public transportation and he can go out alone.  (AR 24, 26, 43, 397, 406, 407.)  He goes to the movies with his wife, camping with friends, has dinner with friends, and visits his mother and his friend's homes.  (AR 24, 27, 32, 33, 43, 407, 433, 434, 495–588, 721, 726, 755.)  Plaintiff enjoys fishing and testified at the June 2013 hearing that he goes "every chance [he] get[s]," which he estimated was about five times a month.  (AR 23, 24, 43, 61.  *See also* AR 398, 407, 434, 706, 726, 735.)  He regularly spends time with his family and speaks to his mother several times a day on the telephone.  (AR 26, 27, 43, 394, 403, 407, 421, 424, 430, 431, 434, 495–588.)  Plaintiff shops with his girlfriend for hygiene products and food once a month for up to four hours.  (AR 25, 26, 27, 32, 33, 39, 41, 397, 406, 421, 423, 433.)  His journal also reflects him shopping for groceries, for costumes for his children, and for Christmas presents.  (AR 27, 32, 33, 41, 495–588.)

The Court finds Plaintiff's daily activities were reasonably considered by the ALJ to be inconsistent with his claims of inability to finish what he started, and to handle stress, changes in routine, and public interaction.  The ALJ also reasonably found Plaintiff's assertions that he cannot stand or sit for more than a few minutes and cannot prepare meals were undermined by his activities.  Even if these activities do not rise to the level of transferable work skills, as Plaintiff asserts, *see* Doc. 19 at 18, they are inconsistent with allegations of completely debilitating impairment.  *Molina*, 674 F.3d at 1113.  To be sure, the evidence of Plaintiff's daily activities in this case may be interpreted more favorably to him.  However, such evidence is susceptible to more than one rational interpretation, and therefore the ALJ's conclusion must be upheld.  *See Burch*, 400 F.3d at 679.  Accordingly, the inconsistencies between Plaintiff's activities of daily living and his complaints was a clear and convincing reason to find his testimony not credible

with regard to his symptoms. *See Gonzalez v. Comm'r of Soc. Sec.*, No. 1:16-cv-03157-MKD, 2017 WL 3712215, at *10 (E.D. Wash. Aug. 8, 2017) (ALJ properly discredited the claimant's subjective complaints of disability headaches, depression, and anxiety where claimant engaged in activities such as taking care of her children; doing household chores such as cleaning, laundry, household repairs, ironing, and mowing; taking her children to school; shopping for clothing, groceries, and personal needs; and paying bills, counting change, and using a checkbook.) *See also, e.g., Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (finding that the ALJ sufficiently explained his reasons for discrediting the claimant's testimony because the record reflected that the claimant performed normal activities of daily living, including cooking, housecleaning, doing laundry, and helping her husband managing finances); *Morgan*, 169 F.3d at 600 (ALJ's determination regarding claimant's ability to "fix meals, do laundry, work in the yard, and occasionally care for his friend's child" was a specific finding sufficient to discredit the claimant's credibility).

### b. Lack of Compliance with Medication and Adequate Control of Symptoms

The ALJ's next ground for discounting Plaintiff's credibility is that Plaintiff was not compliant in taking prescribed medications that, when taken, were successfully helping control his symptoms, which "suggests that his symptoms may not have not been as limiting as [Plaintiff] has alleged in connection with this application and appeal." (AR 44.) As the ALJ sets forth in his decision, the record is replete with instances where Plaintiff reported medication improved his symptoms. (AR 44.) For example, Plaintiff reported in April 2011, that Depakote made him "calmer." (AR 604.) Although he experienced issues with extreme anger and irritability after going without medication for four days, he reported on July 1, 2011, "doing much better" after taking all of his medication regularly. (AR 609.) In May 2012, Plaintiff told Dr. Kifune medication relieved his symptoms. (AR 652.) Plaintiff's status was improved in September 2012, particularly his anger issues, which "improved significantly with change in medication." (AR 852.) In October 2012, Plaintiff presented to Ms. Black as "less agitated." (AR 803.) He reported that the medications are "helping," that he still stays away from people,

but that he took his children swimming and "had a good time." (AR 803.).

On November 6, 2012, Plaintiff reported that his "new medications are working better than the [D]epakote." (AR 794.) Dr. Kifune observed Plaintiff on November 26, 2012, as "gradual[ly] improv[ing]," and Plaintiff reported his current medications "have helped to control anger outbursts better than prior [medications] without the sedation he had been experiencing." (AR 846.) In December 2012, Plaintiff reported his medications "continue to help," although he was still having "anger outbursts where he breaks things at home, and experiences nightmares with significant sweating frequently." (AR 843.) Plaintiff's status had improved in April 2013, and he reported he had not had any "significant emotional outbursts recently." (AR 822.) He noted he had been "much more sedated" as a result of the medication changes the prior month. (AR 822.)

Nonetheless, despite the fact the medication offered him relief from his symptoms, the ALJ noted several examples where Plaintiff did not take it, or took it less often than prescribed. The record indicates Plaintiff went without medication for four days in 2011, during which he experienced issues with extreme anger and irritability. (AR 44, 609.) Plaintiff reported in May 2012 instances of forgetting to take his Depakote, during which he would become "very angry." (AR 44, 652.) In June 2012, Plaintiff reported that he had not been taking his medication for two days due to stomach upset, and then forgot to take them on the third day, when he accompanied his son on a school field trip. (AR 44, 738.) Plaintiff recounted that the field trip was "very overwhelming" and that he got "really angry" at people there. (AR 44, 738.) Ms. Black advised Plaintiff to continue to take his medications and to eat crackers to help upset stomach. (AR 44, 739.) Plaintiff reported on September 10, 2012, he stopped all medications the week prior due to gastrointestinal upset. (AR 44, 645.) Later that month Plaintiff was prescribed different medications, which he reported caused no side effects. (AR 44, 852–83.)

In evaluating a claimant's claimed symptoms, an ALJ may find a plaintiff less credible when his or her symptoms can be controlled by medication. *See* 20 C.F.R. § 416.929(c)(3)(iv); *see also Warre v. Comm'r*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for purposes of determining eligibility for

SSI benefits."); *Morgan*, 169 F.3d at 599 (ALJ's adverse credibility determination properly accounted for physician's report of improvement with medication). An ALJ may also consider a claimant's failure to follow a prescribed course of treatment when weighing a claimant's credibility. *See Tommasetti*, 533 F.3d at 1039–40; *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir.1995). In doing so, however, an ALJ must consider a claimant's explanation for failing to undergo the recommended treatment. *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). As the Ninth Circuit explained in *Fair v. Bowen*, it is the claimant's burden to adequately explain his or her failure to follow a prescribed course of treatment. 885 F.2d at 603 (claimant's failure to explain failure to seek treatment or follow a prescribed course of treatment can "cast doubt" on the sincerity of his testimony); *see also Smolen*, 80 F.3d at 1293. An ALJ may discount a claimant's credibility due to an "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Tommasetti*, 533 F.3d at 1039.

Here, Plaintiff's brief does not address the ALJ's reliance on Plaintiff's improvement with medication and his lack of compliance with his prescribed course of treatment as reasons to discredit his subjective complaints, and therefore he proffers no explanation for his frequent failure to take his medication. In view of Plaintiff not having met his burden of adequately explaining his failure to follow his treatment regimen, *see Fair*, 885 F.2d at 603, and viewing the record as a whole, the Court finds that ALJ's conclusion that Plaintiff was non-compliant with taking medication, and his improvement when he was taking it, is supported by substantial evidence. While the Court could draw an inference from the record that Plaintiff's non-compliance was the result of gastrointestinal side effects and/or memory impairment, the ALJ's different inference that Plaintiff's "symptoms may not have not been as limiting as [Plaintiff] has alleged" is equally supported and will not be second-guessed. *Tommasetti*, 533 F.3d at 1039; *Thomas*, 278 F.3d at 959; *Morgan*, 169 F.3d at 600. The ALJ's determinations that Plaintiff was non-compliant with his use of prescribed medications, and that when taking them he experienced better control of his symptoms, are therefore clear and convincing reasons for discounting Plaintiff's subjective symptom testimony. *Tommasetti*, 533 F.3d at 1039; *Warre*, 439 F.3d at 1006; *Morgan*, 169 at 599; *Fair*, 885 F.2d at 603; *Williams v. Berryhill*, No. 17CV226-

AJB(JMA), 2018 WL 656087, at *10–11 (S.D. Cal. Feb. 1, 2018) (finding the ALJ's determination that Plaintiff was non-compliant with his use of prescribed medication was a clear and convincing reason for discounting Plaintiff's subjective symptom testimony.); *Hives v. Colvin*, No. 2:14-cv-2953-CKD, 2016 WL 336200, at *11 (E.D. Cal. Jan. 28, 2016) (finding the ALJ's determination that the plaintiff's impairments were well-controlled with medication was a clear and convincing reason for discounting the plaintiff's subjective claim that her impairments caused her to be disabled).

### c. Situational Stressors

The final reason given by the ALJ for discounting Plaintiff's subjective complaints was his finding that Plaintiff had experienced "other non-medical problems," which suggested that at least some of Plaintiff's difficulties may be "situational, and not medical, in nature." (AR 45.) As the ALJ noted in his decision, Plaintiff's providers observed his symptoms were exacerbated by situational stressors, including family relationships and medical issues, financial issues, and his housing situation. (*See, e.g.*, AR 618 (treatment note discussing Plaintiff dealing with "some stress due to issues with his siblings"); AR 625 (noting Plaintiff's symptoms are "aggravated by conflict or stress at home or work."); AR 725 (counseling note discussing Plaintiff's stress due to an impending visit from his biological father); AR 732 (counseling note reporting Plaintiff's problems sisters and their boyfriends, whom he believed are just "using" his mom for a place to live); AR 726 (noting conflict in Plaintiff's marriage); AR 724 (counseling note describing Plaintiff's concern that his two-year-old child is bipolar); AR 720 (counseling note discussing Plaintiff's concern about his mother, who informed him she had a blockage in her heart, and that he "really depressed" and "sleeping a lot" as a result); AR 717 (counseling note describing Plaintiff as "really stressed" due to possibility losing his car insurance as a result of the payment being due the same day his wife receives her "monthly money"); AR 745 (discussing stress of Plaintiff's wife having broken her wrist while jumping a fence); AR 768 (counseling note discussing stress associated with Plaintiff's wife increasing her working to four days a week, which would "affect the rent and cash aid"); AR 755 (counseling note describing Plaintiff's worry about what he would do if there were an accident while watching the children, as he has no

cell phone or car to transport them to the hospital); AR 906 (describing Plaintiff as "overwhelmed and depressed" due to his wife having had surgery for cancer and a wildfire causing his evacuation from his home).) The Court finds the ALJ's reasoning was specific, clear and convincing and supported by substantial evidence in the record. *See Chesler v. Colvin*, 649 F. App'x 631, 632 (9th Cir. 2016) (symptom testimony properly rejected in part because "the record support[ed] the ALJ's conclusion that [plaintiff's] mental health symptoms were situational"); *Menchaca v. Comm'r, Soc. Sec. Admin.*, No. 6:15–cv–01470–HZ, 2016 WL 8677320, at *7 (D. Or. Oct. 7, 2016) (symptoms caused by "situational stressors" is "legitimate reason to discount . . . credibility"); *Oraivej v. Colvin*, No. C15-630-JPD, 2015 WL 10713977, at *6 (W.D. Wash. Oct. 5, 2015); *Melendez v. Colvin*, No. 1:13-CV-00691 GSA, 2014 WL 4678272, at *5 (E.D. Cal. Sept. 19, 2014); *DeMaio v. Astrue*, No. 1:09–cv–01840–SMS, 2011 WL 837180, at *12 (E.D. Cal. Mar. 7, 2011) (the fact that Plaintiff was going through a divorce and was experiencing related financial difficulties was relevant to the ALJ's evaluation of the credibility of her subjective symptom testimony). *But see Bryant v. Astrue*, No. C12–5040–RSM–JPD, 2012 WL 5293018, at *5–7 (W.D. Wash. Sept. 24, 2012) (finding mental-health symptoms exacerbated by "situational stressors" "not clear and convincing reason to discount plaintiff's credibility").

Plaintiff asserts in his reply brief that the ALJ's finding that some of Plaintiff's problems may be situational and not medical is erroneous because it ignores that Plaintiff's mental illness "results in his having an abnormally adverse response to seemingly benign everyday interactions with others and typical life situations." (Doc. 21 at 5.) While it is true that Plaintiff's mental impairments could have triggered his reaction to situational stressors (as opposed to the other way around), again this Court may not second-guess the ALJ's credibility finding simply because the evidence may have been susceptible of other interpretations more favorable to Plaintiff. *See Tommasetti*, 533 F.3d at 1039. Moreover, even if the ALJ erred in predicating his credibility determination in part on this finding, such error is harmless because the ALJ articulated other, permissible reasons for discounting Plaintiff's credibility, specifically, as set forth above, evidence in the record that conflicted with Plaintiff's allegation of total disability, including his activities of daily living and non-compliance with prescription medications, which controlled his

symptoms. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).

In sum, because the ALJ provided multiple clear and convincing reasons supported by substantial evidence to discount Plaintiff's credibility regarding his physical and mental limitations, the ALJ's adverse credibility determination shall be affirmed.

**B.      The ALJ Appropriately Assessed the Opinions of Dr. Kifune, Ms. Black, Dr. Rourke, and Dr. Kalman.**

**1.      Legal Standard**

**a.      Drs. Kifune, Rourke, and Kalman**

The weight given to medical source opinions from licensed physicians and licensed or certified psychologists depends in part on whether they are proffered by treating, examining, or non-examining professionals. *Holohan v. Massanari*, 246 F.3d 1195, 1201–02 (9th Cir. 2001); *Lester*, 81 F.3d at 830. Generally speaking, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than a non-examining physician's opinion. *Holohan*, 246 F.3d at 1202.

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830–31. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to weigh the contradicted treating physician opinion, *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir.

2001),[8] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see also Magallanes*, 881 F.2d at 751. The opinion of a non-examining professional, by itself, is insufficient to reject the opinion of a treating or examining professional. *Lester*, 81 F.3d at 831.

### b. Ms. Black

Unlike "acceptable medical sources" Drs. Kifune, Rourke, and Kalman, licensed clinical social workers like Ms. Black are considered "other" medical sources. *See* Social Security Ruling ("SSR") 06–03p (noting that medical sources who are not "acceptable medical sources" include licensed clinical social workers); *see also Kelly v. Astrue,* 471 F. App'x 674, 676 (9th Cir. 2012 (Social workers are not considered "acceptable medical sources" under the regulations.) The ALJ can use these other medical source opinions in determining the "severity of [the individual's] impairment(s) and how it affects [the individual's] ability to work." 20 C.F.R. § 416.913(d). An "other" medical source may not, however, provide medical opinions or be given "controlling" weight as a treating medical source. *See* SSR 06–03p.

An ALJ may not reject the competent testimony of "other" medical sources without comment. *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006). To reject the competent testimony of "other" medical sources, the ALJ need only give "reasons germane to each witness for doing so." *Molina*, 674 F.3d at 1111 (quoting *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010)). In rejecting such testimony, the ALJ need not "discuss every witness's testimony on an individualized, witness-by-witness basis. Rather, if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Id.* at 1114. The ALJ also may "draw inferences logically flowing from the evidence." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

### 2. Analysis

---

[8] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization. 20 C.F.R. § 404.1527.

### a. Treating Physician Dr. Kifune's Opinions

#### i. *August 7, 2012 Medical Source Statement*

On August 7, 2012, Plaintiff's treating physician Dr. Kifune completed an "Assessment of Ability to Do Work-Related Activities (Mental)" form, in which he opined, among other things, that Plaintiff had a seriously limited ability to no useful ability to relate to co-workers, no useful ability to deal with the public, a seriously limited ability to no useful ability to use judgment depending on the situation, and no useful ability to deal with work stressors. (AR 693.) Dr. Kifune further opined that Plaintiff had a seriously limited ability to no useful ability to understand, remember, and carry out complex job instructions, and a seriously limited ability to do the same for detailed, but not complex, job instructions so long as they were written. (AR 694.) He found that Plaintiff had a seriously limited ability to no useful ability to relate predictably in social situations, and estimated Plaintiff would be absent from work two to three times a week due to his impairments or treatment. (AR 694.) The ALJ assigned "little weight" to this portion of Dr. Kifune's opinion. (AR 34.)

Although not specifically identified by the ALJ as a basis for its rejection, this portion of Dr. Kifune's opinion regarding Plaintiff's mental impairments is contradicted by the opinion evidence of psychiatric medical consultant Dr. Warren, who found that Plaintiff has the ability to attend and concentrate for periods of two hours as is required in the workplace, interact appropriately with peers and supervisors, and adapt to routine workplace changes. (AR 676–77.) Dr. Kifune's opinion is also at odds with that of medical expert Dr. Cary, who testified at the February 2016 hearing that Plaintiff would be capable of performing simple, routine tasks with only occasional changes in work setting and occasional interaction with the general public, and occasional interaction with coworkers and supervisors.[9] (AR 171.) Thus, the ALJ was required to state a "specific and legitimate reason," supported by substantial evidence, for rejecting Dr. Kifune's opinion in part.

In giving only "little weight" to the above-described portion of Dr. Kifune's opinion, the

---

[9] The ALJ accorded "significant weight" and "great weight" to the opinions of Drs. Warren and Cary, respectively. (AR 34, 42.)

ALJ stated the findings are "not consistent with the record as a whole," specifically Plaintiff's parental activities. (AR 34.) As set forth more fully above, Plaintiff attends his children's sporting events and singing recitals, helps them sell candy, and takes them to appointments. The ALJ found that Plaintiff's performance of these "fatherly duties" and the severe limitations included in Dr. Kifune's opinion, particularly regarding Plaintiff's lack of ability in dealing with the public and excessive absences from work, were inconsistent. (AR 34–35.) This inconsistency is a valid specific and legitimate reason to reject Dr. Kifune's opinion in part. *See Morgan,* 169 F.3d at 600–02 (considering an inconsistency between a treating physician's opinion and a claimant's daily activities a specific and legitimate reason to discount the treating physician's opinion); *Rollins*, 261 F.3d at 856 (finding that the ALJ gave specific and legitimate reasons for rejecting the opinion of a treating physician where "the restrictions" included in the opinion "appear [ed] to be inconsistent with the level of activity that [the claimant] engaged in").

Plaintiff contends the ALJ erred in finding that Plaintiff's activities are inconsistent with Dr. Kifune's opined limitations because "an ability to function among familiar people or family members in structured environments does not necessarily translate to an ability to perform those same types of tasks in a work setting." (Doc. 19 at 15–16 (citing 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.00 ("Listing 12.00")).) It is not clear, and Plaintiff does not explain, how his attendance at sporting events, singing recitals, and medical appointments, and his assistance with selling candy—all of which presumably occur outside the home—demonstrates an ability to function only among "*familiar* people" or "family members in *structured environments*." Plaintiff's lack of explanation notwithstanding, the Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Thomas*, 278 F.3d at 954; *see also Batson*, 359 F.3d at 1196 ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ."). When the evidence is susceptible to more than one rational interpretation, it is the Commissioner's conclusion that must be upheld. *Thomas*, 278 F.3d at 954. As such, the Court finds that the ALJ provided a valid specific and legitimate reason supported by substantial evidence for rejecting in part the August 7, 2012 opinion of Dr. Kifune regarding Plaintiff's mental limitations as inconsistent with

Plaintiff's parental activities.

### ii. *December 3, 2012 Letter*

On December 3, 2012, Dr. Kifune wrote a letter stating that Plaintiff has been "unable to maintain stable employment" and has been unemployed for several months "due to his inability to control his anger and frustration." (AR 704.) Dr. Kifune's opinion was that he did not "foresee a permanent resolution of [Plaintiff's] health problem," and he therefore supported Plaintiff's application for permanent disability. (AR 704.) The ALJ assigned "little weight" to Dr. Kifune's statements because they "touched upon subject matter reserved to the Commissioner," "did not provide a detailed function-by-function analysis," and are "not consistent" with the medical record, including Dr. Kifune's own treatment notes. (AR 37.)

To begin with, the fact that a treating physician's opinion is on a matter reserved for the Commissioner is in itself not a specific and legitimate reason to reject the opinion. *See Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (The ALJ may not simply reject the treating physician's opinion on the ultimate issue of disability.) *See also Lyon v. Comm'r of Soc. Sec.*, No. 1:16–cv–01634-SAB, 2017 WL 6040422, at *5 (E.D. Cal. Dec. 6, 2017). However, the ALJ's other reasons for discounting Dr. Kifune's opinion are specific and legitimate. The ALJ properly rejected Dr. Kifune's opinion because it is not consistent with the objective medical evidence, including his own treatment notes. *See Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692–93 (9th Cir. 2009) (contradiction between treating physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting opinion); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (same); *Rollins*, 261 F.3d at 856 (ALJ properly rejected the opinion of treating physician, where treating physician's opinion was inconsistent with his own examination and notes of claimant); *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (a treating physician's opinion is properly rejected where the treating physician's treatment notes "provide no basis for the functional restrictions he opined should be imposed on [the claimant]"); *Tonapetyan*, 242 F.3d at 1149 (finding that the ALJ properly rejected the opinion of a treating physician since it was not supported by treatment notes or objective medical findings); *Johnson*, 60 F.3d at 1433 (ALJ properly rejected medical opinion where doctor's

opinion was contradicted by his own contemporaneous findings); *Teleten v. Colvin*, No. 2:14-CV-2140-EFB, 2016 WL 1267989, at *5–6 (E.D. Cal. Mar. 31, 2016) ("An ALJ may reject a treating physician's opinion that is inconsistent with other medical evidence, including the physician's own treatment notes.") (citing *Tommasetti*, 533 F.3d at 1041; *Bayliss*, 427 F.3d at 1216); *Khounesavatdy v. Astrue*, 549 F. Supp. 2d 1218, 1229 (E.D. Cal. 2008) ("[I]t is established that it is appropriate for an ALJ to consider the absence of supporting findings, and the inconsistency of conclusions with the physician's own findings, in rejecting a physician's opinion.") (citing *Johnson*, 60 F.3d at 1432–33). An ALJ may also properly discount a treating physician's opinion that is conclusory and not supported by the medical record. *Batson*, 359 F.3d at 1195 (noting that "an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings") (citing *Tonapetyan*, 242 F.3d at 1149); *Thomas*, 278 F.3d at 957 ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.") (citing *Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).

As the ALJ noted, Dr. Kifune's treatment notes from May 2011 to April 2012 indicate Plaintiff "behaved appropriately for his age." (AR 37, 607, 656, 659, 682.) The ALJ further noted that Dr. Kifune's treatment notes from May 2011 to March 2013 (after Dr. Kifune opined that Plaintiff's ability to work was significantly impaired by his "inability to control his anger and frustration") showed Plaintiff was repeatedly observed as not being agitated, compulsive, and/or anxious during examination. (AR 37, 607, 610, 613, 616, 619, 644, 650, 656, 659, 682, 832, 852–53.) Plaintiff was also noted as being "pleasant" and/or "cooperative" during his examinations with the consultative examiners in 2012, 2013 and 2015. (AR 37, 700, 864, 888.)

Such observations are inconsistent with Dr. Kifune's opinion that Plaintiff cannot work because he is unable to control his anger and frustration. Although Plaintiff asserts Dr. Kifune's other treatment records are actually consistent with his opinion, *see* Doc. 19 at 13, this Court finds the ALJ's determination to the contrary reasonable and will not second-guess it, even if such evidence could give rise to inferences more favorable to Plaintiff. *See Robbins*, 466 F.3d at

882 (citation omitted).

In sum, substantial evidence supports the ALJ's finding that treatment notes showed Plaintiff exhibiting characteristics that are entirely inconsistent with Dr. Kifune's assessment that Plaintiff is disabled due to anger and frustration issues. This inconsistency was a specific and legitimate reason for the ALJ to discount Dr. Kifune's opinion. *See Bayliss*, 427 F.3d at 1216; *Rollins*, 261 F.3d at 856; *Connett*, 340 F.3d at 875; *Tonapetyan*, 242 F.3d at 1149.

### iii. November 11, 2014 Medical Source Statement

Dr. Kifune completed a "Physical Residual Functional Capacity Questionnaire" on November 11, 2014, in which he listed Plaintiff's diagnoses as PTSD, anxiety, ankle pain, and low back pain. (AR 881.) Dr. Kifune indicated in the questionnaire that Plaintiff could walk two city blocks without rest, could sit for one hour at one time, could stand for 30 minutes at one time, could stand and walk less than two hours in an eight-hour workday, and could sit for about two hours in an eight-hour workday. (AR 882–83.) According to Dr. Kifune, Plaintiff required a job that permitted shifting positions at will from standing, standing, or walking, and that Plaintiff would sometimes need to take unscheduled breaks of 15 to 30 minutes every two to three hours of an eight-hour workday. (AR 883.) Dr. Kifune further found that Plaintiff could occasionally lift 10 pounds and rarely 20 pounds, could rarely twist, stoop, crouch, and climb stairs, and could never climb ladders. (AR 884.) He opined that Plaintiff would likely be absent from work as a result of his impairments more than four days per month, and that Plaintiff was incapable of even "low stress" jobs due to his "very significant negative reaction to stress." (AR 882, 885.)

Although not specifically identified by the ALJ as a basis for its rejection, Dr. Kifune's opinion regarding Plaintiff's physical impairments is contradicted by the opinion evidence of medical consultants Drs. Nasrabadi, Linder, and Harper, all of whom found that Plaintiff has the ability to occasionally lift and/or carry 10 pounds and frequently 10 pounds; stand and/or walk for four hours in an eight-hour workday; and sit for about six hours in an eight-hour workday.[10] (AR 199–200, 210, 212–13, 678.) Thus, the ALJ was required to state "specific and legitimate reasons," supported by substantial evidence, for rejecting Dr. Kifune's opinion.

---

[10] The ALJ accorded "great weight" to the opinions of Drs. Nasrabadi, Linder, and Harper. (AR 32.)

In assigning "little weight" to Dr. Kifune's questionnaire responses, the ALJ found it "overly restrictive," in that it is not consistent with both the "conservative treatment Dr. Kifune administered on [Plaintiff] to address his ankle pain" and Plaintiff's activities of daily living. (AR 33.) As to the latter, the ALJ pointed to Plaintiff's reported activities of lifting and carrying his 50-pound daughter five times a day for about three minutes at a time; going fishing for "a couple hours" at a time; taking care of his children from 2:30 p.m. to 11:30 p.m. while his wife is at work; walking his children to school in the mornings; shopping for clothing, groceries, and personal needs for up to four hours; helping his children with their homework; and watching 267 football games in 16 weeks. (AR 33.) The ALJ also noted that Plaintiff denied in his Adult Function Reports having any difficulties with sitting. (AR 33, 408, 435.) The ALJ concluded that these activities "reflect greater lifting, carrying, sitting, walking, standing, stress-tolerance, and attention span abilities than generally reported by Dr. Kifune." (AR 33.) The Court finds this is a valid specific and legitimate reason to reject Dr. Kifune's opinion and that it is based on substantial evidence. *See Morgan*, 169 at 600–02; *Rollins*, 261 F.3d at 856. The Court will therefore not disturb the ALJ's finding on this basis, even if, as Plaintiff points out, *see* Doc. 19 at 12, some of the above-described evidence could be construed more favorably to him. *See Robbins*, 466 F.3d at 882 (citation omitted).

Even assuming arguendo the Court found that the ALJ's reliance on Plaintiff's activities of daily living in assigning little weight to Dr. Kifune's opinion was erroneous, such error would be harmless, *see Carmickle*, 533 F.3d at 1162, in view of the ALJ's other, permissible reason for discounting the opinion: that Dr. Kifune prescribed only a conservative treatment plan (*i.e.*, medications and without physical therapy, injections, or braces). *See Butler v. Colvin*, No. 2:11–cv–2802, 2013 WL 1281777, at *4 (E.D. Cal. Mar. 27, 2013) ("An ALJ may reject the opinion of a treating physician who prescribed conservative treatment, yet opines that a claimant suffers disabling conditions."). *See also Harris v. Comm'r of Soc. Sec. Admin.*, No. CV-16-01994-PHX-GMS, 2017 WL 2060418, at *5 (D. Ariz. May 15, 2017) (finding rejection of treating physician's opinions proper where they were "inconsistent with the medical evidence that demonstrated [the plaintiff] improved while undergoing conservative treatment and medication."). Plaintiff does

not dispute, and the record before the Court supports, the ALJ's findings that Plaintiff received only conservative treatment for his ankle pain.[11]  (*See, e.g.,* AR 142, 150.)  *See Miller v. Astrue*, No. 10–cv–01307, 2011 WL 1935833, at *4 (C.D. Cal. May 20, 2011) (explaining that the claimant's treating physician "prescribed conservative treatment of yoga, exercise, and pain medication").  Moreover, as the ALJ notes elsewhere in the decision, Dr. Kifune prescribed *no* treatment for Plaintiff's low back pain.  (AR 23, 62.)

The Court therefore concludes, based on the foregoing, that the ALJ provided specific and legitimate reasons for discounting Dr. Kifune's opinion regarding Plaintiff's physical limitations, and those reasons are supported by substantial evidence.

### iv. December 8, 2015 Letter

On December 8, 2015, Dr. Kifune wrote a brief letter in support of Plaintiff's application for disability benefits, in which he wrote that Plaintiff "suffers from bipolar disorder and post-traumatic stress and likely has a component of organic brain syndrome as well."  (AR 899.)  He wrote that Plaintiff has "significant emotional and psychiatric disability stemming from past history of physical and emotional abuse."  (AR 899.)  Dr. Kifune concluded the letter by stating that he did "not feel Plaintiff is employable as his social skills are almost non-existent."  (AR 899.)

The ALJ assigned "little weight" to Dr. Kifune's statements because "they reflect little reliance on objective medical evidence and are inconsistent with [Plaintiff's] activities of daily living."  (AR 41.)  As set forth above, an ALJ may properly discount a treating physician's opinion that is conclusory and not supported by the medical record, *Batson*, 359 F.3d at 1195, or that appears to be inconsistent with the level of activity the claimant engaged in, *Rollins*, 261 F.3d at 856.  Here, the ALJ specifically identified medical evidence in the record, including Dr. Kifune's own treatment notes, describing Plaintiff as "pleasant," "cooperative," and "behaving appropriately."  (AR 41–42, 607, 656, 659, 682, 700, 864, 888.)  The ALJ also noted Plaintiff's ability to go shopping, to attend his children's events (including as a chaperone for his son's

---

[11] Apart from identifying it as a reason given for discrediting Dr. Kifune's opinion, *see* Doc. 19 at 12; Doc. 21 at 3, Plaintiff's briefing does not address the propriety of the ALJ's reliance on Plaintiff's conservative treatment.

school field trip despite not being on any medications, which was "very overwhelming" and caused him anger), and to sell candy, as detailed above. (AR 42, 397, 406, 421, 423, 433, 495–588, 738.) This evidence, according to the ALJ, undermined Dr. Kifune's allegations of Plaintiff's mental functioning limitations, particularly his opinion that Plaintiff's social skills are "non-existent." (AR 41–42.) Again, the Court finds this is a valid specific and legitimate reason to reject Dr. Kifune's statements based on substantial evidence, and it may neither reweigh this evidence—even where Plaintiff has identified reasons why this evidence could be reweighed in a manner more favorable to him, *see* Doc. 19 at 13—nor substitute its judgment for that of the Commissioner. *See Thomas*, 278 F.3d at 954; *Batson*, 359 F.3d at 1196.

### b.    Treating Therapist Ms. Black's Opinions

### i.    *November 27, 2012 Letter*

The ALJ gave "little weight" to Plaintiff's therapist Ms. Black's opinion in her letter to Plaintiff's attorney that "between the PTSD and the Major Depression, [Plaintiff] is unable to work in any type of occupation" and that "[Plaintiff] meets the diagnostic criterion for Federal Disability" (AR 697) because Ms. Black was not an acceptable medical source. (AR 37.) This is not a germane reason to discount other medical source testimony. *See, e.g., Haagenson v. Colvin*, 656 F. App'x 800, 803 (9th Cir. 2016) ("The ALJ also failed to provide germane reasons for rejecting the opinions of Haagenson's nurse and counselor, who constitute 'other sources' that can provide evidence about the severity of Haagenson's impairments and how they affect her ability to work. The only reason that the ALJ offered for rejecting their opinions is that they are not 'acceptable medical sources' within the meaning of the federal regulation. However, the regulation already presumes that nurses and counselors are non-acceptable medical sources, yet still requires the ALJ to consider them as 'other sources.'"); *Atkinson v. Colvin*, No. 1:14–cv–01268–AC, 2015 WL 5330794, at *6 (D. Or. Sept. 9, 2015) ("[T]he mere fact that [a psychological counselor] is not a medical source is clearly not a valid or germane reason to discount her assessments of plaintiffs functional limitations; if it were, the Commissioner's express provisions that 'other sources' such as licensed clinical social workers, and 'non-medical sources' who assess or treat a claimant a professional capacity, are 'valuable resources for

assessing impairment severity and functioning' would be meaningless.") (quoting SSR 06–03p at *3).

The ALJ also discounted Ms. Black's statements regarding Plaintiff's ability to work because they "touch[] upon subject matter reserved to the [C]ommissioner." (AR 37.) This reason is specifically germane to disregard Ms. Black's statements.[12] *See* 20 C.F.R. § 416.927(d)(1) (medical source opinion that claimant is disabled concerns issue reserved to the Commissioner and therefore does not mean that the claimant will be found disabled); *see also, e.g., Soria v. Colvin*, No. 1:12–cv–00424–SKO, 2013 WL 1820088, at *13 (E.D. Cal. Apr. 30, 2013) (ALJ properly assigned little weight to counselor's opinion that the plaintiff "did not demonstrate the worker traits of being consistent in his ability to sustain work activities on a full-time basis" because it concerned an issue reserved to the Commissioner).

The other reason provided by the ALJ for discounting Ms. Black's opinion is that it is "conclusory," in that it does not "provide a detailed function-by-function analysis of [Plaintiff's] mental abilities." (AR 37.) This too is a specific and germane reason to give the statements less weight. *See, e.g., Pyl v. Colvin*, No. C13–1428–RAJ, 2014 WL 1671634, at *4 (W.D. Wash. Apr. 28, 2014) (finding the ALJ's reasons for rejecting naturopath's opinion, *i.e.*, that it was conclusory and was not probative of the plaintiff's functional abilities, were germane reasons to reject the opinion.).

In sum, the ALJ provided two specific and germane reasons to give little weight to the November 27, 2012, opinion of Ms. Black, and the ALJ's consideration of this evidence was legally sufficient.

### ii. *November 11, 2014 Medical Source Statement*

On November 11, 2014, Ms. Black completed a "Mental Impairment Questionnaire" co-signed by Dr. Kifune, in which she opined that Plaintiff would be absent from work more than four days per month as a result of his impairments. (AR 879.) Other limitations she noted were Plaintiff's reports that his "legs give out," he is "not able to maintain momentum," symptoms of

---

[12] Other than noting that the ALJ gave little weight to Ms. Black's opinion because it "touched on subject matter reserved to the Commissioner," (Doc. 19 at 14), Plaintiff's briefing does not address whether such reason was legally appropriate.

numbness and low back pain. (AR 880.) As the ALJ noted (AR 41), there is some internal inconsistency with Ms. Black's opinion, which stated that Plaintiff would have four or more repeated episodes of decompensation with a 12 month period, each of at least two weeks' duration, but later noted that Plaintiff would only three episodes within 12 months, each lasting only hours. (AR 879.) The ALJ also observed that no treatment notes from Ms. Black or Dr. Kifune document any of the alleged episodes of decompensation. (AR 41.) This germane reason alone is sufficient for discounting Ms. Black's opinion. *See, e.g., Burkett v. Colvin,* No. C16-5168-JPD, 2017 WL 6049435, at *4 (W.D. Wash. Jan. 20, 2017) ("The ALJ discounted Ms. Nixon's March 2011 opinion as inconsistent with her own treatment notes, which do not document any psychological testing and instead suggest that Plaintiff's symptoms responded well to treatment . . . Plaintiff has failed to show that the ALJ's reasoning was not germane."); *Work v. Colvin*, No. 6:13–cv–597–CL, 2014 WL 5325218, at *4 (D. Or. Oct. 17, 2014) (inconsistency within counselor's statements was a germane reason for rejecting her opinion).

However, the ALJ gives a further reason for assigning little weight to Ms. Black's opinion, that is, it relies on Plaintiff's subjective reports of his limitations without supportive medical treatment for these complaints, in particular, his complaints of leg numbness and low back pain. (AR 41) As discussed above, Ms. Black's (and Dr. Kifune's) treatment records overall fail to provide objective findings that would support the level of limitation assessed, strongly indicating she relied primarily on Plaintiff's subjective complaints and self-reporting of symptoms. An ALJ may reject an opinion that is largely based on a claimant's discredited subjective reports. *Tommasetti*, 533 F.3d at 1041. Here, the Court found the ALJ properly gave limited weight to Plaintiff's credibility because of evidence in the record that conflicted with his allegation of total disability. (*See* Section V.A.2, *supra*.) The fact that Ms. Black's opinion was based upon Plaintiff's subjective symptom reporting, as noted in the questionnaire, and not the medical record is supported by the record and thus an additional germane reason for rejecting her opinion. *Tommasetti*, 533 F.3d at 1041. *See also Ellingson v. Berryhill,* No. 6:16-cv-01358-JR, 2017 WL 3718381, at *6 (D. Or. Aug. 29, 2017) ("[T]he ALJ discounted [plaintiff's treating mental health counselor's] opinion because it was overly reliant on plaintiff's non-credible

subjective complaints. This was a legally-sufficient reason for giving [the] opinion no weight."); *Figueroa v. Astrue,* No. 2:10–cv–01818 KJN, 2011 WL 4084852, at *4 (E.D. Cal. Sept. 13, 2011).

The ALJ's final reason for discounting Ms. Black's opinion regarding Plaintiff's number of likely absences from work is that his "activities of daily living and father duties reflect greater mental functioning." (AR 41.) As set forth above, the ALJ noted Plaintiff's significant activities of daily living, including shopping, paying bills, completing household chores, using public transportation to travel, taking care of his children from 2:30 p.m. to 11:30 p.m. while his wife is at work, getting his children dressed and walking them to school, helping his children with their homework, and taking his children to their medical appointments. (AR 34, 39.) This was yet another germane reason supporting the ALJ's analysis. *See, e.g., Dodd v. Berryhill*, 708 F. App'x 452, 453 (9th Cir. 2018) (giving minimal weight to social worker's and mental health counselor's opinion because of conflicts between these opinions and the plaintiff's reported activities was a germane reason.) (citing *Molina*, 674 F.3d at 1111). Based on the foregoing, the Court finds the ALJ's decision to discount the November 11, 2014, opinion of Ms. Black was without legal error.

### c. Consultative Examiner Dr. Rourke's Opinion

Plaintiff was evaluated by psychologist Dr. Rourke for approximately five hours on October 19 and November 3, 2012, at the recommendation of Dr. Kifune and Ms. Black. (AR 698–702.) Based on his examination and neuropsychological testing of Plaintiff, Dr. Rourke viewed Plaintiff "as manifesting moderate to severe levels of acute and chronic depression as well as severe levels of anxiety (both in the form of social apprehension and trauma related anxiety)." (AR 702.) Dr. Rourke found Plaintiff's prognosis was "guarded" due to the "intensity and severity of his subjective distress and objective behavioral dyscontrol [sic]," and opined that Plaintiff's level of distress and dysfunction was sufficient to expect that he will not meaningfully improve sufficiently for gainful employment for at least a year. (AR 702.) Dr. Rourke concluded his report with his view that he "sees [Plaintiff] as meeting the diagnostic criterion for federal disability." (AR 702.)

The ALJ discounted Dr. Rourke's "conclusory, vague, and non-detailed opinion based on

a one-time evaluation of [Plaintiff]" because it "touched upon subject matter reserved to the Commissioner and does not contain a useful function-by-function analysis of [Plaintiff's] mental abilities." (AR 36.) As set forth above, the rejection of Dr. Rourke's opinion because it is on a matter reserved for the Commissioner is not specific or legitimate reason for its rejection. *See Ghanim*, 763 F.3d at 1161; *Lyon,* 2017 WL 6040422, at *5.

The ALJ's disregard of Dr. Rourke's opinion because it does not contain a useful analysis of Plaintiff's abilities and limitations, is, however, a specific and legitimate reason. *See Batson,* 359 F.3d at 1195 (citing *Tonapetyan*, 242 F.3d at 1149); *Thomas*, 278 F.3d at 957 (citing *Matney*, 981 F.2d at 1019). Such reason is supported by substantial evidence, as Plaintiff himself concedes that Dr. Rourke "did not provide a function-by-functional analysis" in his report. (Doc. 19 at 16.) Contrary to Plaintiff's suggestion, however, Dr. Rourke never rendered any opinion as to the imposition of a specific limitation on Plaintiff's ability to work on a sustained basis. Moreover, it is unclear what functional limitations Plaintiff believes Dr. Rourke actually endorsed that were not accounted for in the ALJ's RFC assessment. Plaintiff asserts that Dr. Rourke's "treatment notes focused on Plaintiff's difficulties with social interaction," *see id.*, but the ALJ's RFC finding incorporated such difficulties by limiting Plaintiff's interaction with the general public, coworkers, and supervisors to "occasional." (*See* AR 28.) Therefore, any error in assigning "little weight" to Dr. Rourke's opinion is at most harmless because it was inconsequential to the formulation of Plaintiff's RFC assessment.[13] *See Carmickle,* 533 F.3d at 1162; *Stout,* 454 F.3d at 1055.

### d. Consultative Examiner Dr. Kalman's Opinions

#### i. October 25, 2013 Evaluation

Plaintiff was evaluated by Dr. Kalman on October 25, 2013. (AR 336–41.) Dr. Kalman

---

[13] Plaintiff appears to suggest the ALJ erred in his RFC finding by "ch[oosing] to rely on the opinions of the non-examining state agency doctors and the non-examining medical expert, each of whom had zero contact with Plaintiff" over Dr. Rourke. (Doc. 19 at 16.) While non-examining professionals do not and cannot "by [themselves] constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician," *Revels v. Berryhill*, 874 F.3d 648, 664 (9th Cir. 2017) (quoting *Lester*, 81 F.3d at 831), such was not the case here. Instead, the ALJ articulated a specific and legitimate reason supported by substantial evidence for the rejection of Dr. Rourke's opinion that Plaintiff "meet[s] the diagnostic criterion for federal disability" because it was conclusory and not accompanied by a function-by-function analysis of Plaintiff's abilities and limitations. (*See* AR 36.)

found, among other things, Plaintiff had markedly limited ability to: understand, remember, and carry out detailed instructions or tasks; work in coordination with or in proximity to others without being unduly distracted by them; and get along with coworkers or peers without distracted them or exhibiting behavioral excesses. (AR 868–70.) He opined Plaintiff's ability to interact appropriately with the general public or customers and to accept instructions and respond appropriately to criticism from supervisors was extremely limited. (AR 868–70.) Dr. Kalman found the following "work-related stressors" would "increase the level of impairment" beyond that which he had already identified: unruly, demanding, or disagreeable customers, even on an infrequent basis; production demands or quotas; a demand for precision; and a need to make accurate, independent decisions in problem solving on a consistent basis. (AR 870.) He opined Plaintiff would likely be absent from work as a result of his impairments five days or more a month. (AR 870.) Dr. Kalman also found that Plaintiff would likely be unable to complete an eight-hour workday five days or more a month. (AR 870.)

Like Dr. Kifune's August 7, 2012 opinion, Dr. Kalman's opinion is contradicted by the medical opinion evidence of Disability Determinations Service medical consultant Dr. Warren and medical expert Dr. Cary. (AR 171, 676–77.) Thus, the ALJ was required to state "specific and legitimate" reasons, supported by substantial evidence, for rejecting Dr. Kalman's opinion.

Here, the ALJ found that Dr. Kalman's opinion was "overly restrictive, based on a one-time evaluation of [Plaintiff], and based on subjective reports from [Plaintiff] that are not consistent with [Plaintiff's] actual activities of daily living." (AR 39.) Simply stating that Dr. Kalman's opinion was "overly restrictive," however, is not a specific and legitimate reason for rejecting it. *See Bryant v. Colvin*, No. 15-cv-02982-JSC, 2016 WL 3405442, at *17 (N.D. Cal. June 21, 2016); *Sweetin v. Colvin*, No. 2:13–CV–03091-WFN, 2014 WL 3640900, at *13 (E.D. Wash. July 22, 2014). Nor is rejecting Dr. Kalman's assessment because it was based on "a one-time evaluation" proper: if a limited treating relationship constituted a legitimate reason for rejecting an opinion from a treating or examining source, an opinion from an examining source would always be rejected because the relationship between a claimant and an examining physician is generally limited to a single examination, rendering that opinion worthless. *See*

*Grayson v. Astrue*, No. 2:11–cv–1656–EFB, 2012 WL 4468406, at *5 (E.D. Cal. Sept. 25, 2012) (citing *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (holding that while a limited treating relationship may be a valid reason for not according a treating physician's "findings the conclusive weight of a treating medical-source opinion, . . . it is not by itself a basis for rejecting them—otherwise the opinions of consultative examiners would essentially be worthless . . . .")).

An ALJ may, however, reject an opinion that is largely based on a claimant's discredited subjective reports, *Tommasetti*, 533 F.3d at 1041, or that conflicts with a claimant's daily activities, *Morgan*, 169 at 600–02; *Rollins*, 261 F.3d at 856. Here, Dr. Kalman's report recited Plaintiff's statements regarding his level of functioning, including that he did not do his own shopping, cooking, or housekeeping; could not manage his own transportation; and did not pay his own bills. (AR 865.) The ALJ found these statements inconsistent with reports by Plaintiff and his girlfriend that he was able to go shopping for groceries, pay bills, complete various household chores, use public transportation to travel, take his children to their medical appointments, walk his children to school, and heat a "Hot Pocket" in the microwave or make sandwiches. (AR 39.) These are the same activities the ALJ found undermined Plaintiff's credibility as to his claims of disabling symptoms, which the Court affirmed. (*See* Section IV.A.2.a, *supra*.) The ALJ further found that Dr. Kalman's opinion that Plaintiff would likely be absent from work as a result of his impairments five days or more a month and unable to complete an eight-hour workday five days or more a month (*see* AR 870) conflicted with Plaintiff's reported activities of taking care of his children from 2:30 p.m. to 11:30 p.m. while his wife is at work, helping them with their homework, getting them dressed, and walking them to school, all of which Plaintiff performed without any evidence of truancy or discipline by the school. (AR 39.)

Plaintiff asserts, based on *Ryan v. Commissioner*, 528 F.3d at 1199–1200, that the ALJ erred in rejecting Dr. Kalman's opinions by questioning Plaintiff's credibility and that the ALJ "has not cited any evidence that Dr. Kalman relied primarily on Plaintiff's subjective reports rather than the doctor's own professional judgment." (Doc. 19 at 13–14, 16.) In *Ryan*, the Ninth Circuit stated that "an ALJ does not provide clear and convincing reasons for rejecting an

examining physician's opinion by questioning the credibility of the [claimant's] complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." 528 F.3d at 1199–1200. However, the Ninth Circuit goes on to state that there was "nothing in the record to suggest" the examining physician in that case relied on the claimant's own "description of her symptoms . . . more heavily than his own clinical observations." *Id.* at 1200. Contrary to Plaintiff's assertion, the same is not true with respect to Dr. Kalman's report.

Dr. Kalman's report explicitly provides that its "sources of information" were "[*Plaintiff*] *who was a fair historian* and accompanying records which included diagnoses of bipolar, depression, and post traumatic [sic] stress disorder." (AR 863 (emphasis added).) Dr. Kalman wrote that Plaintiff "states he got [a scar on the left side of his head] as a toddler jumping off a retaining wall and fracturing his head," and from this concluded that his "poor performance on the cognitive functioning scale may be in part due to the head trauma which he suffered in early childhood." (AR 864–65.) He relied on Plaintiff's own history for his finding that Plaintiff is "[s]ignificant for paranoid delusions with thought broadcasting": "[Plaintiff] readily acknowledged paranoid feelings." (AR 865.)

It is true that Dr. Kalman also includes a handful of his own observations in his assessment, but these observations do not particularly support the opinions he eventually offers. He states that Plaintiff's "speech was average rate and volume," that his eye contact was "good," and he was "cooperative." (AR 864.) He found Plaintiff's abstract thinking to be intact, his interpretations concrete, and his form of thought "logical and goal directed," with no "mood swings" or "emotional lability." (AR 865.) Given these observations, it is unclear how Dr. Kalman could reach his opinions regarding Plaintiff's work limitations without also relying "to a large extent" on Plaintiff's own self-reports. *See, e.g., Bennett v. Colvin*, 202 F. Supp. 3d 1119, 1132 (N.D. Cal. 2016); *Verduzco v. Colvin*, No. 14–CV–02698–BLF, 2015 WL 4881201, at *6 (N.D. Cal. Aug. 14, 2015) ("Because Dr. Farr necessarily must have relied upon Plaintiff's self-reports as to the level of her pain . . .the ALJ properly could have rejected Dr. Farr's opinion based upon an appropriate adverse credibility finding with respect to Plaintiff."); *Sampson v.*

*Colvin*, No. 1:14–CV–03136–JTR, 2015 WL 3970415, at *9 (E.D. Wash. June 29, 2015) ("The fact that Dr. Mabee could not rely on psychological testing to assess Plaintiff's impairments, and did not personally observe Plaintiff suffering from any mental disorders, suggests that Dr. Mabee instead relied mostly on Plaintiff's self-reports.").

Accordingly, the Court finds that ALJ's assignment of "little weight" to Dr. Kalman's report because it was to a large extent based on Plaintiff's subjective reports properly discredited, *Tommasetti*, 533 F.3d at 1041, and also inconsistent with Plaintiff's actual activities of daily living are legitimate and specific reasons supported by substantial evidence showing that Plaintiff may not have been as "fair" a historian as Dr. Kalman specified in his report, *Morgan*, 169 at 600–02; *Rollins*, 261 F.3d at 856.

### ii.      March 13, 2015 Evaluation

On March 13, 2015, Plaintiff underwent a second consultative psychological evaluation with Dr. Kalman. (AR 887–90.) Dr. Kalman's opinion was, among other things, that Plaintiff is not able to interact with supervisors and co-workers, that he cannot deal with the public, and that he cannot maintain attention, concentration, and memory. (AR 890.) The ALJ assigned "little weight" to these findings by Dr. Kalman because they were "again based on [Plaintiff] underreporting his activities of daily living to Dr. Kalman as described above." (AR 40.) As with his prior evaluation, Dr. Kalman stated that he relied on Plaintiff as a "fair historian" (AR 887), yet Dr. Kalman's recitation of Plaintiff's daily activities and social functioning does not include, for example, that Plaintiff attends his children's sporting events and singing recitals, helps them sell candy, takes them to medical appointments, and walks them to school. Nor does it include the fact that Plaintiff goes shopping and uses public transportation to travel. The Court finds that the ALJ articulated a specific and legitimate reason supported by substantial evidence to disregard Dr. Kalman's report in part. *Morgan*, 169 at 600–02; *Rollins*, 261 F.3d at 856.

//

//

//

**C.** **Although the ALJ Erred in his RFC Finding by Not Addressing or Accounting for the "Simple One- or Two-Step Instructions" Assessment by Dr. Kalman, Such Error is Harmless.**

### 1. Legal Standard

At Step Five, the Commissioner considers the RFC assessment, the claimant's age, education, and work experience to determine if the claimant is able to perform other work. 20 C.F.R. § 416.920(a). The RFC assessment consists of the "physical and mental" limitations on what a claimant can do as a result of his impairments. 20 C.F.R. § 416.945(a)(1). The ALJ then evaluates potential occupations that a claimant can perform. *See* 20 C.F.R. § 416.966. The DOT is used to determine what jobs exist in the national economy. *Zavalin v. Colvin*, 778 F.3d 842, 846 (9th Cir. 2015). The DOT lists the General Education Development ("GED") Levels needed for a job, such as the "aspects of education (formal and informal) . . . required of the worker for satisfactory job performance." *Id.*; DOT, App. C, 1991 WL 688702 (4th ed. 1991).

The GED Levels consist of "the reasoning ability required to perform the job, ranging from Level 1 (which requires the least reasoning ability) to Level 6 (which requires the most)." *Zavalin*, 778 F.3d at 846. Reasoning Level One is defined as ability to "[a]pply commonsense understanding to carry out simple one–or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1002–03 (9th Cir. 2015). Reasoning Level Two is defined as being able to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." *Id.* The ALJ may also rely on the testimony of a VE for information on what occupations a claimant can perform given his or her RFC. 20 C.F.R. § 416.966(e); *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009). Lastly, the ALJ takes all the information, including "the claimant's [RFC], age, education, and work experience" to determine if he or she can perform a job in the national economy. *Valentine*, 574 F.3d at 689; *see also* 20 C.F.R. § 416.920(g). If conflict arises between the VE's testimony and the DOT, the ALJ "is required to reconcile the inconsistency." *Zavalin*, 778 F.3d at 846.

### 2. Analysis

Plaintiff's final assertion of error is that the ALJ's finding at Step Five was incorrect because the occupations of hand bander (DOT code 920.687-030) and bag cutter (DOT code 789.687-010), two of the three jobs the VE identified and upon which the ALJ relied, have a reasoning Level Two, which exceeds Plaintiff's limitation to tasks with one- to two-step instructions. (*See* Doc. 19 at 19–20; Doc. 21 at 6–7.) In response, Defendant correctly points out that "the ALJ never found that Plaintiff was limited to [one- to two-step] tasks; instead, he found that Plaintiff retained the RFC to perform simple work." (Doc. 20 at 14.) The error lies, however, in the ALJ's failure to address and account for this distinction.

The ALJ determined that Plaintiff had a RFC to "perform sedentary work . . . limited to work that is defined as simple by the [DOT], [SVP] levels 1 and 2, routine and repetitive tasks . . . ." (AR 28.) The ALJ also gave "significant weight" to the March 2015 opinion of consultative examiner Dr. Kalman that Plaintiff could "understand, remember, and carry out simple one and two-step job instructions." (AR 890.) The ALJ characterized this limitation as "consistent with the findings of the State Agency medical consultant and the findings of [Plaintiff's] primary treating physician." (AR 40.) The ALJ further found this limitation "account[s] for [Plaintiff's] severe impairments and subjective complaints." (AR 40.)

Both parties appear to agree that there is a critical distinction between the "simple one- or two-step instructions" assessment by Dr. Kalman and the "simple" work with "routine and repetitive tasks" limitation adopted by the ALJ, and both cite *Rounds v. Commissioner Social Security Administration* in support. (*See* Doc. 19 at 20; Doc. 20 at 14.) In *Rounds*, the ALJ's RFC determination limited the plaintiff to "one to two-step tasks." 807 F.3d at 1003. A vocational expert testified that the plaintiff could perform jobs like a kitchen helper, hand packager, and recycler—all requiring Level Two reasoning on the GED scale. *Id.* at 1002. On appeal, the plaintiff argued that the RFC limitation to "one to two-step tasks" matched Level One reasoning ("ability to carry out simple one–or two-step instructions") and, therefore, she could not as a matter of law perform the Level Two reasoning jobs identified by the vocational expert. *Id.* at 1103. The Ninth Circuit agreed and found a conflict between the RFC limit to "one and two step tasks" tasks and the Vocational Expert's selection of Level Two reasoning jobs, given

the "close similarity" between the RFC limitation and Level One reasoning. *Id.* The Ninth Circuit remanded the case so that the ALJ could articulate a reasonable explanation to justify relying on the vocational expert's testimony and selection of Level Two reasoning jobs. *Id.* at 1004.

*Rounds* illustrates that an important distinction exists between Level One and Level Two reasoning jobs, with Level One jobs typically aligning with the ability to perform one- or two-step job instructions. However, *Rounds* differs from this case in a significant way. The conflict in *Rounds* focused on the differences between the RFC-imposed limitation to one and two-step jobs and the vocational expert's identification of appropriate jobs falling at Level Two. *Id.* Here, the conflict is *not* between the ALJ's RFC-imposed limitation ("simple" work with "routine and repetitive tasks") and the VE's testimony identifying Level Two jobs. Instead, the alleged conflict is between Dr. Kalman's assessment (that on its face potentially matches Level One reasoning) and the ALJ's RFC-imposed limitation to simple work with repetitive and routine tasks.

A number of district courts in this Circuit, citing *Rounds*, have reversed ALJ decisions imposing a "simple, repetitive tasks" RFC limit where the ALJs fail to address and distinguish conclusions by doctors that claimants can perform one-and-two step instructions. *See Wilson v. Colvin*, No. 16-CV-01971-WHO, 2017 WL 1861839, at *7 (N.D. Cal. May 9, 2017) (collecting cases). Here, the Court finds, following *Rounds*, that there is a significant distinction between a limitation to one-to two-step instructions and an RFC allowing performance of simple work with repetitive and routine tasks. The ALJ's assignment of "significant weight" to Dr. Kalman's functional assessment effectively limiting Plaintiff to carrying out simple one and two-step job instructions, but subsequent failure to address or account for this assessment in the RFC finding was therefore erroneous. *See Wilson*, 2017 WL 1861839, at *7.

The Commissioner points out that the ALJ "found that Plaintiff could do more than Dr. Kalman indicated—indeed, he specifically rejected Dr. Kalman's opinion that Plaintiff could not maintain attention, concentration, or memory." (Doc. 20 at 14.) While true, the ALJ was still required to give a reasoned explanation of why he was apparently rejecting the *one-and-two step*

*instructions* limitation assessed Dr. Kalman, despite the ALJ's assignment of significant weight to it. The ALJ gave no reason accounting for his failure to include such limitation in his RFC assessment. The Commissioner's post-hoc attempts to buttress the ALJ's decision are not sufficient. *See, e.g., Hill v. Astrue*, 698 F.3d 1153, 1159–60 (9th Cir. 2012) (ALJ must give clear and convincing reasons to "reject an examining physician's opinion").

However, in addition to the hand bagger and bag cutter jobs, the ALJ also adopted the VE's testimony that Plaintiff could perform the job of final assembler (optical) (DOT code 713.687-018), of which there are 7,000 jobs nationally. (AR 46–47.) Pursuant to the DOT, final assembler (optical) is a Level One reasoning job, *see* 713.687-018 FINAL ASSEMBLER, DICOT 713.687-018, 1991 WL 679271, which, as set forth above, is consistent with Dr. Kalman's assessment limiting Plaintiff to carrying out simple one and two-step job instructions. *See Rounds,* 807 F.3d at 1003. Thus, even if the ALJ had included such limitation in Plaintiff's RFC, the ALJ met his burden at Step Five because the record contains substantial evidence demonstrating that Plaintiff was capable of performing the Level One reasoning job of final assembler (optical) and that it exists in significant numbers in the national economy.[14] (*See* AR 46–47, 173, 175.) Accordingly, Plaintiff has not met his burden of showing that the ALJ's error was harmful.[15] *See, e.g., De La Fuente v. Colvin*, No. CV 14–1112 AGR, 2014 WL 6630019, at *2 (C.D. Cal. Nov. 21, 2014) ("Based on the vocational expert's testimony that there are 2,600 such jobs in Los Angeles County, the shirt presser job alone existed in significant numbers in the national economy. Accordingly, any error was inconsequential to the ultimate nondisability determination.") (internal citations omitted) (citing *Molina*, 674 F.3d at 1121–22); *Koller v. Colvin*, No. 3:13–cv–05330–RBL–KLS, 2014 WL 868830, at *7 (W.D. Wash. Mar. 5, 2014) ("[The ALJ also identified an unskilled job at step five, and this job alone exists in significant

---

[14] Plaintiff's argument that because "[t]he VE did not address whether the one remaining job, final assembler, exists in significant numbers standing alone, [] the agency has failed to meet its step-five burden," *see* Doc. 19 at 20; Doc. 21 at 7, is without merit. *See Gaston v. Astrue*, No. 3:11-CV-00339-JE, 2012 WL 3264547, at *10 (D. Or. Aug. 9, 2012) ("The Commissioner can satisfy his burden at step five by demonstrating that a claimant can perform a single occupation.") (citing 20 C.F.R. §§ 404.1566(b), 416.966(b)),

[15] Plaintiff further alleges that the ALJ erred in finding that Plaintiff could perform the bag cutter job because the DOT describes it as "light" instead of "sedentary" work. (*See* Doc. 19 at 19–20; Doc. 21 at 6–7.) Even assuming (without deciding) that Plaintiff is correct, such error would be harmless for the same reason as set forth above.

numbers in the national and regional economy, which renders any error as to the semi-skilled jobs harmless.").

## VI.     CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **March 21, 2018**                          /s/ *Sheila K. Oberto*

                                         UNITED STATES MAGISTRATE JUDGE